**Elizabeth DOLE, Secretary of Labor, United States Department of Labor**

**v.**

**SOLID WASTE SERVICES, INC., a corporation, trading as J.P. Mascaro & Sons and as Hoch Sanitation and Lackawanna Transport Company; J.P. Mascaro & Sons, Inc. trading as J.P. Mascaro & Sons and Hoch Sanitation and Lackawanna Transport Company, Pasquale Mascaro, Individually as employer for Solid Waste Services, Inc. and J.P. Mascaro & Sons, Inc., Mike Mascaro, Individually as employer for Solid Waste Services, Inc. and J.P. Mascaro & Sons, Inc., Joseph P. Mascaro, Individually as employer for Solid Waste Services, Inc. and J.P. Mascaro & Sons, Inc.**

**Civ. A. No. 88–1066.**

United States District Court, E.D. Pennsylvania.

July 14, 1989.

---

George P. Salem, Solicitor of Labor, Marshall H. Harris, Regional Solicitor, Linda M. Henry, Atty., U.S. Dept. of Labor, and Jerry G. Thorn, Acting Sol. of Labor, Philadelphia, Pa., for plaintiff.

William F. Fox, Jr. and Sean P. Flynn, Norristown, Pa., for defendants.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HUYETT, District Judge.

### TABLE OF CONTENTS

INTRODUCTION .................................................. 900
FINDINGS OF FACT .............................................. 900
 I. Corporate Structure ...................................... 900
 II. Employment of Minors .................................... 901
 III. Deduction of Time for Lunch Breaks ...................... 902
 IV. JPM .................................................... 902
 A. Classification 200 ................................... 902
 B. Classifications 201 and 202 .......................... 903
 C. Classification 203 ................................... 904
 D. Classification 300 ................................... 905
 E. Classification 301 ................................... 906
 V. Hoch Sanitation ........................................ 907
 A. Classifications 200, 201, 202 and 300 ................ 907
 B. Classifications 303 and 305 .......................... 908
 C. Classification 306 ................................... 909
 VI. Lackawanna Transport Drivers ........................... 910
 VII. Interstate Commerce Exemption ........................... 912
 VIII. Evidence Related to the Liquidated Damages Claim ....... 916
DISCUSSION .................................................... 918
 I. Post–Trial Motions ..................................... 918

 A. The Secretary's Motion to Amend ............................... 918
 B. Defendants' Motion for Directed Verdict ....................... 921
 II. *Undisputed Issues* ............................................ 922
 A. Defendant Corporations Constitute An Enterprise .............. 922
 B. Pat, Mike and Joe Mascaro Are Employers ..................... 923
 C. Employment of Minors ........................................ 923
 III. *Disputed Issues* ............................................. 924
 A. Minimum Wage Violations and Lunch Deduction ............... 924
 B. Recordkeeping Violations ..................................... 924
 C. Overtime Violations ......................................... 925
 D. Statute of Limitations ....................................... 927
 IV. *Defenses* ................................................... 928
 V. *Injunctive Relief* ........................................... 930
 A. Liquidated Damages ......................................... 931
CONCLUSIONS OF LAW ................................................ 932
ORDER ............................................................. 934

## INTRODUCTION

This action is brought by the Secretary of Labor to enjoin the individual defendants and defendant corporations they own and control from violating sections 6, 7, 11, 12, and 15 of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* [hereinafter, the Act or the FLSA]. The complaint seeks injunctive relief, backwages, and an award of liquidated damages pursuant to section 16(c) of the Act, 29 U.S.C. § 216(c).

During the period covered by the complaint, January, 1985 through February, 1989, defendants employed over 300 individuals in the solid waste disposal industry. The vast majority of these individuals are covered by the FLSA. Complexity is added to what would have been a relatively straightforward case by defendants' corporate structure and payroll practices. In three separate "divisions," defendants maintain at least twenty-five separate payroll classifications.

Trial without a jury was held over eleven days in February and March, 1989.[1] During the course of pre-trial proceedings, it became clear that this is essentially a factual dispute in which the result turns largely upon the credibility of the witnesses and the accuracy of the Secretary's methods of computing overtime wages due employees. In addition to voluminous documentary exhibits, testimony from sixty-five witnesses

was presented. The parties also submitted pre- and post-trial motions, briefs, and proposed findings of fact and conclusions of law.

In the post-trial motions, the Secretary moves to amend the complaint to add Lackawanna Transport, Inc. as a defendant and to include employees employed by it in the action. Because I will grant plaintiff's motion to amend the complaint, I shall include Lackawanna Transport, Inc. as a defendant in making the findings of fact and the caption of the action will be amended accordingly. Defendants move to strike the Secretary's request for liquidated damages under section 16(c) of the Act. Because the substance of this motion should have been raised as a demand for a jury trial in advance of trial, I will deny defendants' motion. I will discuss these motions further below.

## FINDINGS OF FACT

Pursuant to Fed.R.Civ.P. 52(a), I make the following findings of fact:

### I. *Corporate Structure*

1. Defendants are engaged in the trash removal and solid waste disposal industry. Notes of Testimony, March 23, 1989 at 70–71.[2]

2. J.P. Mascaro & Sons, Inc. was incorporated in or about 1970. The original

---

**1.** Testimony was heard on February 22, 23, and March 7, 8, 13, 16, 20, 21, 23, 27, 30, 1989.

**2.** The trial transcript hereinafter will be cited as N.T., date, page number. *E.g.*, N.T., 3/23 at 70–71.

shareholders were J.P. Mascaro,[3] Joe Mascaro, Frank Mascaro, Lou Mascaro, Mike Mascaro, and Pasquale ("Pat") Mascaro. N.T., 3/23 at 74.

3. Hoch Sanitation, Inc. was formed by the Mascaros in late 1984 or early 1985. N.T., 3/23 at 75.

4. Lackawanna Transport Company, Inc. was formed by the Mascaros in late 1985 or early 1986. N.T., 3/23 at 76.

5. On or about January 1, 1987, the Mascaros formed Solid Waste Services, Inc. On or about the same date, J.P. Mascaro & Sons, Inc., Hoch Sanitation, Inc., and Lackawanna Transport Company, Inc. became owned and controlled by Solid Waste Services, Inc. ("Solid Waste"). Each of the predecessor companies became an operating division of Solid Waste. N.T., 3/23 at 76–78.

6. At all times relevant to this action, these companies were owned and controlled by Joseph P. Mascaro, Mike M. Mascaro and Pat Mascaro (collectively, the "Mascaros").

7. The business affairs of all defendants are operated together. The operating divisions of Solid Waste, defendants Hoch Sanitation, Inc. ("Hoch"), Lackawanna Transport, Inc. ("Lackawanna"), and J.P. Mascaro & Sons, Inc. ("JPM") share the same officers and controller. N.T. 3/27 at 96, 3/23 at 74–76, 78. The payroll system for all defendants is operated from the corporate headquarters by a payroll clerk. N.T., 3/23 at 83. At the operating centers, payroll data is compiled on a daily basis. Id.

8. Lou and Frank Mascaro are not actively engaged in the management of the companies' affairs. N.T., 3/23 at 84. Pat, Joe, and Mike Mascaro are employers, as defined by section 3(d) of the Act, 29 U.S.C. § 203(d), of the employees listed on schedules A, B, and C of the complaint as amended by plaintiff's motion to amend during trial. Court Exhibit 1 at ¶ 3[4]; N.T., 3/23 at 82–83.

9. Pat Mascaro sets pay practices for employees, N.T., 3/27 at 38, and the budget for payroll. N.T., 3/27 at 84.

10. Joe Mascaro manages existing facilities, oversees the construction of new facilities and purchasing. N.T., 3/23 at 82. Joe also informs employees about wage rates and practices. N.T., 2/22 at 137.

11. Mike Mascaro manages the defendants' business in Montgomery County. N.T., 3/23 at 82. He hires employees for Lackawanna, N.T., 2/22 at 94, directs employees' work hours, N.T., 2/22 at 87; 3/23 at 37; 3/20 at 74, and sets wage rates for Lackawanna employees. N.T., 2/21 at 119; 3/20 at 58; 3/23 at 37. He also answers employee inquiries concerning wages and employment policies. Id.

## II. Employment of Minors

12. The following minors were employed by defendants:

| Name | Date of Birth | Age when Employed | Citation |
|---|---|---|---|
| Vernon Wright | 10/30/69 | 17 | GX 24 |
| Troy Schneck | 11/5/71 | 16 | GX 24, DX 4 |
| E. Hardy | n/a | 17 | N.T., 2/22 at 48 |
| J. Hardy | n/a | 15 | Id. |
| H. Reynolds | 1/20/70 | 16 | N.T., 3/8 at 61. |
| J. Reynolds | 11/6/68 | 17 | N.T., 3/8 at 58. |

---

3. J.P. Mascaro was the father of the individual Mascaro defendants. Mr. Mascaro passed away prior to the times relevant to this action.

4. Two stipulations were entered into by the parties, Court Exhibit 1 and Court Exhibit 2. Hereinafter, courts exhibits will be cited as "CX," the Secretary's exhibits as "GX," and defendants' exhibits as "DX."

13. Wright, Schneck, Reynolds, and the Hardys were employed by Hoch as pickers or truck loaders. In those capacities, they worked on the exterior of motor vehicles loading trash while the vehicle traveled on public roads.

### III. Deduction of Time for Lunch Breaks

14. Solid Waste and its operating divisions deducted one-half hour per day from the pay of all hourly employees for a lunch break. DX 1 at 9; N.T., 3/8 at 46; 3/13 at 8, 29; 3/21 at 27.

15. Defendants' general manager testified that the half hour is deducted whether or not the employee actually takes the break. N.T., 3/21 at 53.

16. The employee policy manual states: Each employee must take a thirty (30) minute lunch period every day. Employees are not allowed to work through lunch without prior approval from your supervisor. The lunch period must be indicated on the daily time record.
DX 1 at 9.

17. Despite this written policy, there is overwhelming credible evidence that defendants actively *discouraged* employees from taking a lunch break.

18. Employees were threatened with termination if they took too long to complete a load; the threats discouraged employees from taking the meal break. N.T., 3/7 at 17, 3/8 at 16–17; 3/13 at 7–8. On one occasion, Joe Mascaro responded to a delay at the Souderton yard caused by employees leaving their work to get lunch by saying, "We'll get them on the ball, we do not take lunch breaks around here." N.T., 3/7 at 20. When at the yard during lunch periods, truck driver employees were told to stay with their trucks. N.T., 3/13 at 45.

19. The per trip pay system, the long hours required to fulfill job requirements, and time restrictions at landfills discouraged tractor-trailer drivers from eating other than while working. N.T., 2/22 at 57, 72, 88, 119–20; 2/23 at 16, 24; 3/20 at 6; 3/23 at 48.

20. In response to the practices of defendants and the work requirements, the vast majority of employees did not take a regular half hour lunch break. N.T., 2/22 at 43, 72, 119–20, 138, 165; 3/7 at 17, 19; 3/8 at 7, 38–39; 3/13 at 7, 25–26; 3/20 at 6; 3/23 at 40, 48. Most employees ate while performing work related tasks. N.T., 2/22 at 18, 72, 88, 165; 2/23 at 16, 24, 27; 3/7 at 19, 23, 33; 3/8 at 7, 38–39; 3/13 at 7–8, 22; 3/20 at 6, 28–29; 3/21 at 79–80; 3/23 at 40, 48.

21. Through cross-examination, defendants attempted to establish that all employees did take a lunch break on at least sporadic occasions.

22. The Secretary's evidence establishes that the defendants were not justified in uniformly deducting the 2½ hours per week per employee.

23. Accordingly, the Secretary's compliance officer's calculation that employees are entitled to 2½ hours per week of additional compensation for the time defendants wrongfully deducted as a lunch break is reasonable.

### IV. JPM

24. The employee classifications of this division relevant to this case are 200 rear loader drivers; 201 front loader drivers; 202 roll-off drivers; 203 tractor-trailer drivers; 300 pickers; and 301 station laborers. CX 1, CX 2.

#### A. Classification 200

25. Classification 200 employees are rear-end loader route drivers in Norristown, Ambler, and Jenkintown, Pennsylvania and other municipalities. Employees in this category are listed in GX 9 and GX 25. There are approximately 25 employees in this class.

26. These employees were paid a day rate or salary that was based incorrectly on a fluctuating work week method of computing wages. N.T., 3/7 at 29; 3/13 at 21–22, 102–05; 3/21 at 49–51.

27. Hours worked were not recorded for these employees. N.T., 3/7 at 32; 3/8 at 89; 3/13 at 22.

28. These employees generally began work between 5:00 a.m. and 6:00 a.m. 3/7 at 28; 3/8 at 85; 3/13 at 20. They general-

ly concluded work between 5:00 p.m. and midnight. N.T., 3/7 at 28–29; 3/8 at 85; 3/13 at 23.

29. This period of time is corroborated by the periods of time that the pickers generally worked when the extra duties of the drivers are considered. One picker testified that he met the truck around 5:00 a.m., and generally finished his route between 1:30 p.m. and 4:30 p.m. N.T., 3/8 at 138–39.

30. Defendants introduced the testimony of Ron Kershner, a management employee who worked for a short period as a Norristown route driver. N.T., 3/23 at 5, 8. Based on the short period of time Kershner worked as a driver, his current position as a management employee, and my observation of him at trial, I do not find credible his testimony that the routes could be generally completed in seven and one-half to eight hours.

31. Based on credible testimony, classification 200 employees worked an average twelve hour day for the days their payroll records reflect they were paid. N.T., 3/7 at 28; 3/8 at 85; 3/13 at 23.

32. Classification 200 employees did not receive time and a half wages for hours worked in excess of 40 hours worked per week. These employees are entitled to time and one-half wages for hours worked in a week over 40.

33. Employees in this classification generally did not take lunch. Finding 23.

34. Accordingly, I find that classification 200 employees worked 60 hour weeks, and did not take the 2½ hours per week lunch breaks which were deducted from their pay.

35. The Secretary's compliance officer's calculations of wages due classification 200 employees in GX 9, GX 25, Appendix D and Appendix F (submitted post-trial) are not consistent with the evidence adduced at trial.

B. Classifications 201 and 202

36. Classification 201 employees are front-loader drivers. Employees in this

category are listed in GX 6 and GX 25. There are 27 employees in this class.

37. Classification 202 employees are "roll-off" drivers. Employees in this category are listed in GX 7 and GX 25. There are 59 employees in this class.

38. Many employees in these classifications did not record their own hours. N.T., 3/7 at 18, 3/8 at 16, 32, 37, 47, 87; 3/13 at 5, 26. Some employees in these classifications did not know when their time cards were being punched. N.T., 3/7 at 18. Many employees performed work related tasks before their time cards were punched in, or after their time cards were punched out. N.T., 3/7 at 18; 3/8 at 15–16, 19, 37, 87, 88; 3/13 at 5–7, 16–17, 27–28.

39. On some occasions, when employees returned from their routes, they were not punched out when their duties were completed because they did not have access to their time cards, and management personnel had left for the day. N.T., 3/8 at 30–31, 41, 51; 3/13 at 16.

40. Some employees in these classifications credibly testified that the hours reflected in their paychecks did not correspond to the hours they actually worked. N.T., 3/8 at 48; 3/13 at 9, 28.

41. The Secretary has computed backwages for employees in these categories for the period from January, 1985 to June 24, 1987. GX 6, 7, 25.

42. Defendants offered the testimony of several witnesses to show that employees in these classes punched their own time cards. However, some of these witnesses testified that they did not punch their own time cards during the times at which the Secretary is seeking backwages. N.T., 3/20 at 131, 136, 153. Others were not employed by defendants during the relevant time period. N.T., 3/20 at 118, 127; 3/21 at 16. Thus, defendants offered no testimony that conflicts with that of the Secretary's witnesses on the issue of time card punching during the January, 1985 to June, 1987 period.

43. Defendants have produced no time records for employees in these classifications.

44. Accordingly, I find that the credible testimony establishes that employees in classifications 201 and 202 worked an average of 2½ hours per week in work related tasks that were not reflected in the employee's time cards and paychecks. This time was spent performing an average of one-half hour per day of work related tasks before and after the employee's time cards were punched in or out. Any difference between the actual time spent before or after the time cards were punched in or out and this half hour is attributable to the inaccurately recorded hours worked.

45. The Secretary's compliance officer calculated an average five hours per week of uncompensated time for employees in these classifications. GX 6; GX 7; 3/13 at 91, 98–101. This estimate includes the 2½ hours of additional work time and 2½ hours of time that the defendants deducted for lunch breaks not taken. Finding 23. This estimate is reasonable, conservative and consistent with the evidence adduced during trial.

46. Employees in these classifications received overtime pay for hours worked in excess of 40 during one week. N.T., 3/13 at 143–44; 3/23 at 96.

C. Classification 203

47. Classification 203 employees are tractor-trailer drivers. Employees in this category are shown on GX 4, GX 20 and GX 25. There are approximately 68 employees in this class.

48. Payroll records for these employees reflect the number of trips per employee per week. GX 5, 19, 20, 25.

49. No records of hours worked were kept for classification 203 tractor-trailers drivers. They did not punch a time clock. N.T., 2/22 at 57–58, 72–73, 89, 144, 156–57, 165; 2/23 at 7, 24–25.

50. Until approximately November, 1987, employees in classification 203 drove tractor-trailer rigs back and forth between the company's transfer facility at Souderton, Pennsylvania and the Keystone Landfill at Dunmoore, Pennsylvania. This distance is approximately 105 miles one way. N.T., 2/22 at 60, 138

51. Classification 203 drivers were paid on a per-trip basis at the rate of $40 per trip. During the average full work week, each driver made approximately eleven trips, two each day during the week and one on Saturday. N.T., 2/22 at 56, 72, 129, 141, 153, 164; 2/23 at 3, 11.

52. Many of these employees began work by arriving at the landfill with a full load or would pick-up a full load near the landfill between 4:00 a.m. and 5:00 a.m. N.T., 2/22 at 78, 80, 116, 130, 154, 160.

53. The Keystone Landfill began allowing trucks to dump at various times between 5:00 a.m. and 7:00 a.m.

54. On days when the weather caused delays at the landfill, it could take up to four hours for a truck to be emptied at the landfill. N.T., 2/22 at 122, 131,; 2/23 at 13.

55. During the period immediately prior to the landfill's closing, drivers experienced significant delays while their loads were checked by environmental authorities. N.T., 2/22 at 70, 124.

56. Accordingly, I find that the time spent at the landfill per trip averaged three-quarters of an hour, or forty-five minutes.

57. At the Souderton transfer station, drivers performed maintenance checks of the trailers, refueled their rigs and completed paperwork as they dropped off the empty trailers and picked up a full trailer. On some occasions, drivers experienced significant delays at the Souderton yard while they waited for full trailers. N.T., 2/22 at 81–82, 144, 147, 156, 162; 2/23 at 6–7, 20, 22.

58. Accordingly, I find that the drivers averaged one-half hour per trip engaged in work related duties at the Souderton yard.

59. The one way driving time from Souderton to the landfill was two and one-half hours on average. N.T., 2/22 at 61, 73, 132, 143, 151, 155; 2/23 at 6, 13; 3/21 at 57.

60. One defense witness, John Smith, testified that it took "a good four hours" to complete "the whole shooting match."

N.T., 3/21 at 84, 94. This witness also inferred that he was more than willing to break the speed limit to accomplish this feat. *Id.* at 94. This statement, coupled with my observation of the witness during his testimony, forces me to find that John Smith was not a credible witness.

61. Some drivers experienced significant delays occasionally caused by mechanical failures in their rigs. N.T., 2/22 at 55–56, 75, 133–34, 145–46; 2/23 at 5.

62. Accordingly, I find that the credible testimony establishes that the average total round trip time, including all work related tasks, was six and one-quarter hours. This includes five hours of driving time, three-quarters of an hour at the landfill, and one-half hour at the Souderton yard.

63. Given eleven trips per week at six and one-quarter hours per trip, classification 203 drivers worked approximately 68 and ¾ hours per week.

64. Classification 203 drivers worked weeks longer than 40 hours consistently. Defendants did not pay these employees time and one-half their regular rate of pay for hours worked in excess of 40 in a week. N.T., 2/22 at 56, 72, 134, 146, 158, 164; 2/23 at 8, 17, 22–30.

65. Employees who inquired about pay for time spent waiting at landfills or at the Souderton yard were told that they were paid on a "per trip" basis regardless of the hours it took to complete each trip. N.T., 2/22 133, 158; 2/23 at 23–24.

D. Classification 300

66. Classification 300 employees are trash pickers in Norristown, Pennsylvania and other municipalities. CX 2. There are approximately 69 employees in this classification. GX 5, 25.

67. Employees in this classification are paid on a day rate basis. N.T., 3/8 at 125.

68. The Secretary presented one employee witness from this class, Donald Dorman, Jr. N.T., 3/8 at 120.

69. Dorman credibly testified that he typically began his work day at approximately 5:00 a.m. and ended work for the day between 1:30 p.m. and 4:30 p.m. N.T., 3/8 at 138–39.

70. In the middle of the working day, after the trash truck was filled with the first load of the day, Dorman would be allowed to return to his home for approximately three hours. N.T., 3/8 at 126–28.

71. A Norristown route truck driver credibly testified that he regularly left his pickers in Norristown while the driver traveled to Souderton to empty his truck. N.T., 3/7 at 26.

72. Defendants' management employee witnesses Pat Thornhill and Ron Kershner credibly testified that employees in this classification were allowed to go home while the truck on which they were working was being dumped at Souderton. N.T., 3/23 at 6–7; 3/21 at 45.

73. Therefore, employees in classification 300 had ample opportunity to take a lunch break during the day and are not entitled to compensation for 2½ hours of time for lunch breaks not taken.

74. Through the one employee witness in this classification, the Secretary did present evidence that one picker, James Eubanks remained with his driver while the truck was emptied. N.T., 3/8 at 123–24, 127.

75. However, the Secretary produced no evidence that Eubanks was required to ride with the driver as part of his job, or that Eubanks performed any work related tasks while he was riding with the driver.

76. Accordingly, the evidence at trial does not establish that any employees in classification 300 worked over 40 hours in a week and were not compensated for overtime hours worked in a week in excess of 40.

77. Pat Mascaro testified that some employees in this classification who met their driver at the Souderton yard punched a time clock at that facility. N.T., 3/23 at 91.

78. Defendants did not introduce any time records for these employees at trial.

79. Pat Mascaro further testified that employees who met their drivers on the routes in the municipalities did not punch a time clock. N.T., 3/23 at 91.

80. Based on this testimony, the failure of defendants to produce any time records for these employees during trial, and the overall practices of defendants concerning the keeping of time records for other classifications of employees, I find that defendants did not keep time records for employees in classification 300.

E. Classification 301

81. Classification 301 employees include yard laborers at the Souderton transfer station. CX 2. However, at least one employee in this class was a driver. GX 5 (Martin Schmidt).

82. The Secretary presented one witness, James Reynolds, Jr. from this class. N.T., 3/8 at 57. I found him a candid and credible witness. His testimony was corroborated by the statements of other witnesses.

83. Reynolds testified that he worked as a "yard jockey" from June, 1986 to December, 1986. *Id.* at 58.

84. Reynolds did not punch his time card. It was punched by his supervisors. *Id.* at 62–63. Frequently, the supervisor punched Reynolds out when he (the supervisor) left for the day. *Id.* at 64.

85. This testimony is consistent with that of the truck drivers who utilized the Souderton yard during this time period. Findings 57, 62, 64.

86. On many occasions, Reynolds and the other laborers with whom he worked continued work after the supervisor left for periods of two to four hours. *Id.* at 63–65, 74.

87. Reynolds worked with Bob Bedford, Mike Engdahl, Frankie Brown, Chris Engdahl, Daniel Engdahl, his brother, Danny Basco, and another employee, Kip (last name unknown). *Id.* at 66. These employees worked the same hours Reynolds did.

88. Because of the nature of his work, and the constant arrival of trucks to be dumped, these employees did not receive a lunch break. *Id.* at 67. This is corroborated by the testimony of the truck drivers who dumped at the Souderton yard during this time period. Findings 20, 23.

89. Defendants produced no evidence which controverted Reynolds testimony for the period prior to January, 1987.

90. Defendants introduced the testimony of two witnesses who worked in the yard subsequent to January, 1987. Joseph C. Todd, Sr., began working at the yard on August 19, 1987. N.T., 3/20 at 138. Jefferey A. Thompson began working in the Souderton yard in January, 1988. *Id.* at 162–63. Defendants also introduced the testimony of Samuel E. Smith, who was the Souderton yard manager from November, 1987 to January, 1989. N.T., 3/21 at 22–23.

91. These employees testified that yard employees punched their own time cards for the period during which they had knowledge of the yard and that the time cards accurately reflect the time each employee worked. N.T., 3/20 at 140–42, 158–59; 3/21 at 25.

92. These employees also testified that they regularly took a one-half hour lunch break during the period of their employment. N.T., 3/20 at 146, 159; *see also* 3/23 at 2–3.

93. The defendants have produced no evidence to controvert that of the Secretary's that before August, 1987, classification 301 employees regularly worked hours "off the clock" and through their lunch hours.

94. Accordingly, I find that classification 301 employees who worked in the Souderton yard prior to August, 1987 are entitled to compensation for an average of three hours per day for time not recorded on their time cards, or fifteen hours per week, and two and one-half hours per week for time deducted from their pay for a lunch break which they did not take. To the extent that when this additional 17½ hours is added to the hours shown on the defendants' time records for each employee, the total exceeds 40 hours worked in a week, the employee is entitled to compensation at time and one-half his regular rate of pay. This estimate is reasonable and con-

sistent with the evidence adduced at trial.[5]

95. The Secretary seeks compensation for three employees shown as classification 301 employees, Joann Imalka, Sharon Levandowski and Deborah Tomazewski, who worked as dispatchers at the Souderton yard. GX 25. The defendants' records show that these employees were paid on a salary basis with no overtime wages paid for hours worked in a week over 40, and that no time records were kept for these employees.

96. The defendants knew the Secretary was seeking compensation for these employees and defendants produced no evidence concerning these employees.

97. The total evidence presented at trial supports a finding that these employees were not performing management tasks.

98. Given the failure of the defendants to provide any evidence concerning these employees, an estimate of five additional hours per week worked in excess of 40 is reasonable and justified by the evidence adduced at trial. This reasonable and very conservative estimate is derived from the hours worked by the yard employees, the truck drivers whom these employees were presumably dispatching, and the strong likelihood that these employees were required to perform job related tasks while they ate lunch on numerous occasions.

99. Classification 301 employee Homer Butler was employed as a mechanic for two years at the Keystone landfill by J.P. Mascaro and Lackawanna. 3/20 at 96–97. Butler was paid a salary of $600.00 per week and was not paid a premium for hours worked in excess of 40 per week. Id. at 98–99.

100. No records of Butler's hours worked were maintained. Id. at 102.

101. Butler was a mechanic who completed some minor paperwork, and did not perform management functions. Id. at 103–104.

102. Butler credibly testified that he reported to work at the landfill between 4:00 a.m. and 5:00 a.m., id. at 97, 99, and completed his job generally at 3:00 p.m. Id. at 97. Butler's presence at the landfill during these hours was corroborated by the testimony of the drivers who dumped at the landfill. On average, Butler worked an additional hour twice a week. Id. at 98–99. He generally took a thirty to forty-five minute lunch break. Id. at 103.

103. Accordingly, I find that Butler worked an average 57 hours per week, with 17 hours of overtime each week. The Secretary has calculated backwages due Butler based on a 57 hour week. GX 25. This average is based on Butler's credible and uncontradicted testimony. It is reasonable and conservative.

## V. Hoch Sanitation

104. The employee classifications relevant to this case are 200 rear loader drivers; 201 front loader drivers; 202 roll-off drivers; 300 Borough Pickers; 303 Allentown Pickers; 305 Allentown Drivers; and 306 Northern Division employees. CX 1, 2.

### A. Classifications 200, 201, 202 and 300

105. Classification 200 employees are rear-loader drivers. CX 1, 2. There are approximately ten employees in this class. GX 16, 26, 26A.

106. Classification 201 employees are front-loader drivers. CX 1, 2. There are approximately six employees in this class. GX 15, 26, 26A.

107. Classification 202 employees are roll-off drivers. CX 1, 2. There are approximately five employees in this class. GX 17, 26A.

108. Classification 300 employees are laborers and pickers in the "Borough" division. CX 1, 2. There are approximately twenty employees in this class. GX 13, 26.

---

**5.** Some employees in this classification are shown on the Secretary's exhibits as being entitled to three hours per week of additional compensation based on evidence provided to the Secretary. GX 5, GX 25. I find that the credible testimony of the compliance officers establishes that this is proper for the employees shown on the exhibits as receiving three hours until August, 1987 for lunch breaks not taken and hours worked that were improperly recorded.

109. Employees in these classifications were paid an overtime premium wage of a base hourly rate plus one-half the rate for hours worked in a week in excess of 40. N.T., 3/7 at 73, 75; 3/8 at 10.

110. Further, these employees were paid an additional "bonus," which was a flat payment, for performing extra work, such as additional trips or routes. N.T., 3/7 at 74–75; 3/8 at 11.

111. The defendants' payroll records reflect that these employees were paid a half time premium for hours worked over 40 in a week. Further, the records reflect that these employees were paid additional "bonus" payments for the performance of additional work. GX 13, 15, 16, 17, 26, 26A. The "bonus" payments were not included in computing the employees' regular rate of pay for purposes of computing the proper overtime premium wage. N.T., 3/16 at 34–35, 37–38, 38–39, 39–40.

112. The Secretary's compliance officer calculated additional overtime for these employees based on inclusion of the "bonus" payments in the employees' regular rate of pay. *Id.*

113. Accordingly, I find that the method used by the Secretary in calculating the regular rate of pay and the overtime wages due for these employees is reasonable.

B. Classifications 303 and 305

114. Classification 303 employees are pickers in the City of Allentown. CX 1, 2. There are approximately 131 employees in this class. These employees are listed in GX 11, 26, and 26A.

115. Classification 305 employees drive rear-end loaders in the City of Allentown. CX 1, 2. There are approximately 51 employees in this class. These employees are listed in GX 14, 26 and 26A.

116. Classification 303 and 305 employees were paid on a day rate basis. Classification 303 employees were paid $45 per day, and classification 305 employees were paid $75 per day. N.T., 3/7 at 57; 3/16 at 30. Some employees in these classifications were paid a bonus, rather than over-time wages, for extra work above their required minimum amount of work.

117. Employees in these classifications were not paid overtime for hours worked in a week over forty. N.T., 3/7 at 37, 56.

118. Some employees in these classifications credibly testified that they sometimes punched themselves in and out on a time clock, N.T., 3/7 at 57; 3/8 at 36, 68, 106. Sometimes, other employees or supervisors punched employees in and out. N.T., 3/7 at 57, 58; 3/8 at 110–111, 114.

119. Defendants presented the testimony of Michael Thompson, a dispatcher at the Hoch facility in Allentown. N.T., 3/21 at 118. Thompson testified that classification 303 employees generally worked approximately six to seven hours a day. *Id.* at 126.

120. This statement is contradicted by the defendants' time records and the witness's cross-examination testimony. Thompson testified that it was generally not true that classification 303 employees averaged lesser hours than classification 305 drivers. *Id.* at 125. However, defendants' payroll records show that on average, classification 303 employees worked less hours than the drivers. For example, for the week of July 17, 1987, classification 305 employees Acevedo, Bundy, Butler, Harding, Hughes and Hunger are shown on the defendants' payroll records as having exceeded 60 hours of work. GX 26. Two pickers, Spengler and Guiterrez, recorded more than 60 hours, but eight other pickers recorded less than 60 hours. GX 26.

121. This discrepancy, and my observation of the witness during trial, leads me to find that Thompson was not a credible witness.

122. The Secretary's compliance officer used the hours as reflected in the defendants' payroll records as the best available record of hours worked for employees in these classifications. N.T., 3/16 at 30–31, 36–37. While other evidence adduced during trial causes me to be skeptical of the accuracy of the hours recorded on defendants' payroll records as being accurate representations of hours actually worked,

and defendants' policy of punching employees in these classifications in and out compounds my concerns, the defendants have provided no other records of hours worked by classification 303 and 305 employees.

123. Accordingly, I find that the hours reflected in the defendants' payroll records for classification 303 and 305 employees provide a reasonable record of the hours these employees actually worked. For weeks in which employees in these classifications worked in excess of 40 hours, such employees are due additional overtime for hours in excess of 40.

C. Classification 306

124. Classification 306 employees work in the "Northern" division. CX 1, 2. There are approximately 58 employees in this class. GX 12, 26, 26A.

125. Classification 306 employees were paid on a day rate basis. N.T., 2/22 at 15, 31, 46; 3/16 at 33. These employees were not paid a premium wage for hours worked in a week in excess of 40. *Id.*

126. The employees who testified during trial credibly testified that all Northern division employees worked approximately the same hours. N.T., 2/22 at 15, 46.

127. The employees also credibly testified that they worked 9 to 11 hour days on "short days" during the week and approximately 8 hours on Saturdays. N.T., 2/22 at 16, 23, 28, 37, 45. On "long days," the employees worked up to 16 hours. N.T. 23, 30. Employees in this classification consistently worked hours well in excess of 40. N.T., 2/22 at 14, 28, 45.

128. The employees who testified stated that the defendants did not accurately record their hours worked. N.T., 2/22 at 16, 20, 24, 30–31.

129. Defendants' attempted to rebut this testimony by showing that employees in this classification were responsible for keeping their own time records through the testimony of the former manager of the Northern division, Anthony Spinozza, and documents which were purportedly time cards completed by the 306 employees. N.T., 3/30 at 2; DX 5. Specifically, Spinoz-

za testified that employees were responsible for keeping their time cards and completing the time cards themselves. N.T., 3/30 at 5.

130. First, on cross-examination, Spinozza testified that he could not explain several discrepancies between DX 5 and the defendants' payroll records. *Id.* at 12.

131. Second, the total hours worked on the time cards frequently are not correctly reflected in the defendants' payroll records, GX 23. *E.g.*, Paul Baker: 8/1/87 time card—51.5 hours, 8/7/87 payroll—48 hours; Richard Frampton Sr.: 8/8/87 time card—61.25 hours, 8/14/87 payroll—49.25 hours; Paul Cosgrove: 12/5/87 time card —50.5 hours, 12/11/87 payroll—48.5 hours; David Karosus: 4/16/88 time card—62 hours, 4/22/89 payroll—52 hours.

132. Third, many cards do not show total hours worked in a week; only the notation "shuttle." *E.g.*, DX 5 at Karl Bowder Sr., 1/10/88, 1/17/88. Spinozza testified that the "shuttle" notation rendered the employee's actual hours worked irrelevant. N.T., 3/30 at 11.

133. Fourth, and most importantly, many of the cards could not have been completed by the employee himself, unless he changed the spelling of his own name from week to week. DX 5 at David Karosus (4/16 card name spelled "D. Karousses", next card spelled "Dave Karosus"). Other cards contain precisely the same handwriting for different employees. *Compare* DX 5 Paul Baker, 7/25/87 *with* Karl Bowder, Jr., 1/10/88. Other cards show the same handwriting for several employees in one week. *E.g.*, DX 5, 2/6/88 cards for Krawcyk, Knick, Baker, Cosgrove, Bowder, Jr., Mill.

134. Based on these unexplained discrepancies, I find that these cards are either, at worst, blatant forgeries, visible to an untrained eye, or, at best, wholly unreliable indicators of the hours classification 306 employees actually worked.

135. Defendants offered no testimony from any witness with personal knowledge of hours worked by classification 306 employees, and no explanation for these dis-

crepancies. Rather, defendants attempted to attack the Secretary's compliance officer's basis for his estimate. N.T., 3/16 at 58–60. When I suggested that proper impeachment of the officer's testimony could be done with the use of the actual time cards, they eventually produced DX 5. *Id.* at 60.

136. Defendants also did not submit time cards for employees in any other employee classification.

137. Based on the unreliability of the time cards and my observation of the witness during trial, I find that Spinozza's testimony concerning Northern Division employees was not credible.

138. I credit the testimony of the Secretary's witnesses [6] concerning hours worked in a week of an average of twelve to thirteen hours per day during the week and six to eight hours per Saturday.

139. Accordingly, I find that the Secretary's compliance officer's estimate of an average 70 hour work week for 306 employees is reasonable and based on an approximation consistent with the credible evidenced adduced during trial.

### VI. *Lackawanna Transport Drivers*

140. Lackawanna Transport tractor-trailer drivers are classification 103 and 203 employees. There are approximately 63 employees in these classifications. GX 22, 27.

141. Defendants generally kept no records of hours worked for employees in these classifications.

142. It is undisputed that these employees drove from facilities in Lower Merion, Abington, Pennsylvania and the Kraft Food plant in South Philadelphia to the Keystone landfill at Dunmore, Pennsylvania, the "G.R.O.W.S./Waste Management" landfill at Langhorn, Pennsylvania, or the "Buckhorn Transfer Facility" during the 1986 to 1988 period. The dispute is the length of time for a trip between these various facilities.

143. Employees in these classifications were paid on a per trip basis, and the rate per trip varied among the different destinations. Defendants' payroll records show that employees were paid $40–$48 per trip to Keystone from Lower Merion or Abington; $27 to $36 from Lower Merion or Abington to Morrisville; $50 to $60 from South Philadelphia to Keystone.

144. During the time waste was being dumped at Keystone, as with other tractor-trailer drivers in defendants employ, employees in these classifications reported to the landfill between 4:00 a.m. and 5:00 a.m. N.T., 2/22 at 80, 3/20 at 3, 21, 33, 44, 79; 3/23 at 12, 42. Employees were instructed to be at the landfill early to be at the front of the line when the landfill opened at various times between 5:00 a.m. and 7:00 a.m. N.T., 2/22 at 87; Finding 52.

145. Drivers spent an average of approximately one hour in the morning and approximately one-half hour during the second run of the day waiting to dump their loads. N.T., 3/20 at 3, 22, 44, 80; 3/23 at 12–13, 44. Thus, I find that the time spent waiting at the landfill averaged three-quarters of an hour for each load.[7]

146. The evidence establishes that a one-way drive from Dunmore to Abington took an average of two to two and one-half hours. N.T., 3/20 at 4, 22, 44, 80; 3/21 at 59, 87; 3/23 at 12, 46. Round-trip driving time, therefore, averaged approximately five hours.

---

**6.** One witness, McNamara, testified that he never questioned the accuracy of the hours reported on his pay check. N.T., 2/22 at 20. Defendants' post-trial submissions suggest that the failure of an employee to question his hours as reported on the pay check stub should bar the employee from now questioning the accuracy of the hours on the stub. To the extent necessary, based on my observation of the employee witnesses during trial, I find that many of these employees were of limited mental capacity, and could not reasonably be expected to raise this issue with their supervisor. Further, there is abundant evidence that, if complained about, the employees' complaints would fall on deaf ears.

**7.** This waiting period is further corroborated by the testimony of the JPM tractor-trailer drivers who also spent approximately forty-five minutes per trip of time waiting at the landfill. Finding 56.

147. The evidence establishes that a round-trip drive from Dunmore to Lower Merion took an average of five and one-half hours. N.T., 2/22 at 87, 100, 113, 177.

148. Employees in these classifications also worked at the yards in Lower Merion or Abington from one-half to three hours while unhooking the empty trailers, hooking up filled trailers, inspecting and servicing their rigs, and on some occasions waiting for trailers to be filled. N.T., 2/22 at 82, 114; 3/20 at 4, 23, 44–45, 80; 3/23 at 46.

149. The two defense employee witnesses testified that it took fifteen minutes to one hour at the yards to complete a "turnaround." N.T., 3/21 at 60–61, 88. In Finding 60, *supra*, I found that the testimony of Smith was simply not credible. To the extent Reese's testimony is credible, it is also substantially consistent with that of the Secretary's witnesses.

150. Including all the time spent working during the day, these employees credibly testified that they averaged eleven to seventeen hours per day. N.T., 2/22 at 85, 113; 3/20 at 6, 32, 85; 3/21 at 71–72; 3/23 at 12–17, 19–20.

151. Accordingly, I find that the average time per trip spent working is six and one-half hours per trip from Abington and seven hours per trip from Lower Merion. This approximation is based on the average driving time for each facility, 45 minutes at the landfill per trip, and 45 minutes at the yard. It is reasonable and consistent with the credible testimony of the Secretary's and defense witnesses.

152. During 1987 and 1988, employees principally drove from Lower Merion and Abington to a landfill at or near Morrisville, Pennsylvania called the G.R.O.W.S./Management landfill. N.T., 2/22 at 97; 3/20 at 82; 3/23 at 17, 47.

153. The roundtrip driving time from Abington to G.R.O.W.S. was between two and three hours. N.T. 3/20 at 5, 26, 83; 3/23 at 21, 47.

154. The round trip driving time from Lower Merion to G.R.O.W.S. was between

two and one-half to three hours. N.T., 3/20 at 55; 3/23 at 22.

155. The wait to dump at this landfill was between one-half hour to four hours depending on the weather. N.T., 3/20 at 5, 26–27, 68, 83; 3/23 at 21, 23, 47.

156. The Secretary's compliance officer estimated an average of three and one-half hours of work per trip from Abington to the landfill and four hours of work per trip from Lower Merion to the landfill. He then calculated hours worked per week based on the rate of pay for a load to and from these facilities. N.T., 3/30 at 29–30.

157. Accordingly, I find the Secretary's compliance officer's estimate and method reasonable and consistent with the credible evidence adduced at trial. The estimate of time spent per load waiting at the landfill and changing trailers at the yards is reasonable and conservative.

158. Defendants offered no evidence which seriously contradicts the estimates of time from Lower Merion and Abington to G.R.O.W.S.

159. Some employees also made trips from the Kraft Food plant in South Philadelphia to Dunmore. N.T., 3/20 at 57; 3/23 at 31.

160. The round trip driving time from South Philadelphia to the landfill was between six and eight hours. N.T., 3/20 at 57; 3/23 at 31.

161. These employees waited one-half hour at the plant for the truck to be loaded, and three quarters to one hour at the landfill for the load to be inspected before they were allowed to dump. *Id.*

162. The Secretary's compliance officer estimated eight and one-half hours of work per trip. He then used the rate of pay per load to estimate the hours worked per week for these employees.

163. Accordingly, I find the Secretary's compliance officer's methods of computing hours worked and overtime wages due are reasonable and based on the credible evidence adduced at trial. The estimate of time spent per load waiting at the landfill and waiting for the trailer to be loaded is reasonable and conservative.

164. Defendants offered no evidence to controvert this estimate.

165. Some employees also travelled from Abington to a facility referred to as "Buckhorn." N.T., 3/21 at 74; 3/ 23 at 25. The precise location of this facility is not evident from the evidence adduced at trial.

166. This facility was a transfer station at which the waste was baled. N.T., 3/23 at 25.

167. The evidence adduced at trial from the Secretary's witnesses shows that the round trip driving time from Abington to this facility was between five and six hours. N.T., 3/21 at 74; 3/23 at 25. The wait at this facility was between one-half and four hours. N.T., 3/21 at 74; 3/23 at 25.

168. The Secretary's compliance officer estimated working time per round trip to Buckhorn averaged six and one-half hours, and computed working time based on the wage paid for this trip. GX 27 and Appendix G (submitted post trial).

169. Defendants offered no evidence concerning the time it took to get to this facility, where the facility was located, or where the waste was transported to once it was baled at this facility.

170. Accordingly, I find the Secretary's compliance officer's methods of computing hours worked and overtime wages due are reasonable and consistent with the credible evidence adduced at trial. The estimate of one hour of time working at the yard and waiting at the facility to dump is reasonable and conservative.

171. Three individuals, Emory Barone, Earl Farmer, and Norman Howard, are shown on Lackawanna Transport's records as yard jockeys. GX 27; N.T., 3/23 at 27, 29.

172. The defendants' records further reflect that individuals who worked as yard jockeys were paid a salary, and hours worked were not recorded. GX 27. The salaries do not reflect the payment of an overtime premium for hours worked in excess of 40 in a week.

173. Actual hours worked records were available for Emory Barone for the period prior to June 3, 1986. These records consistently reveal that Barone worked more than forty hours in a week on average. GX 22, 27; N.T., 3/30 at 33–34.

174. This evidence is corroborated by the testimony of tractor-trailer drivers who consistently testified that yard jockeys worked during the period that the yards were open. N.T., 3/21 at 75–77; 3/23 at 16, 27–28. The yard jockeys' hours included time spent waiting for trucks to return for third loads during the week and approximately a minimum of three hours of work on Saturdays when the yards were open.

175. The Secretary's compliance officer estimated that these employees were entitled to compensation for a 45 hour work week, based on this evidence and the defendants' records. N.T., 3/30 at 32.

176. Defendants offered no evidence to controvert this estimate.

177. Accordingly, I find that the Secretary's compliance officer's methods and estimate of overtime wages due are reasonable and consistent with the evidence adduced at trial.

### VII. Interstate Commerce Exemption

178. The evidence concerning the transport of waste from the various defendant companies to landfills outside the state of Pennsylvania is less than clear. It is difficult to precisely determine the exact dates when the Hoch and Lackawanna divisions began transporting out-of-state, which employees were involved in the stream of transporting the waste out-of-state, and during what periods specific employees were involved in the interstate transport of waste. These difficulties are occasioned by defendants' failure to provide records to support the testimony of their witnesses.[8]

---

8. As it is the employer's burden to establish an exemption, *Idaho Sheet Metal Works, Inc. v. Wirtz,* 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966), and such exemptions are narrowly construed against the employer, *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959), I resolve any irreconcilable conflict in the evidence in favor of the Secretary. *Guthrie v. Lady Jane Collieries, Inc.,* 722

179. Defendants own and operate a landfill in Wetzel County, West Virginia. N.T., 3/27 at 8–9. Defendants also dump waste at several other landfills in Ohio and West Virginia. *Id.*

180. A receipt dated June 24, 1987 represents the first load of waste that was transported to West Virginia from the Souderton yard, where JPM waste was transferred. N.T., 3/27 at 18; DX 13.

181. Waste was transported to the Souderton yard by all classifications of employees of defendant JPM, except classification 203 tractor-trailer drivers. N.T., 3/8 at 19, 40, 48; 3/7 at 38.

182. Further, the log sheets for the West Virginia landfill show that beginning at least by October 1, 1987, numerous loads of waste generated by JPM were deposited there daily. DX 16.

183. After June 24, 1987, the waste dumped at the Souderton yard was moved onto trucks for transport out-of-state within twenty-four (24) hours. The content of the waste was not processed. N.T., 3/27 at 27–28.

184. The Secretary's compliance officer submitted revised backwage computations which exempt all JPM employees except classification 203 employees as Appendix F to its post-trial submissions. These computations delete overtime calculations for hours over 40 worked during a week by JPM employees except classification 203, for the period beginning June 24, 1987.

185. Accordingly, I find these revisions reasonable and consistent with the evidence concerning when JPM employees became regulated by the Secretary of Transportation.

186. The Secretary presented the testimony of a number of classification 203 employees who worked for JPM at periods *before* June 24, 1987. N.T., 2/22 at 141 (driver from May, 1986 to May, 1987), 153 (driver during June or July, 1986); 2/23 at 3 (driver from August, 1985 to March, 1986), 11 (driver during late, 1985 to early, 1986), 22–23 (driver from January, 1986 to August, 1986 and from January, 1987 to May, 1987). These employees did not transport waste out-of-state. N.T., 2/22 at 128, 133; 2/23 at 3, 11, 22–23. However, it is not disputed that defendants were not transporting waste out-of-state at the times these employees worked for JPM.

187. Thus, the Secretary's direct evidence does not address where classification 203 employees drove after June 24, 1987.

188. However, in reviewing the revised wage transcription sheets, computed from the employers' records, conclusions may be drawn about the transport of waste out-of-state by classification 203 employees.[9]

189. There are a total of 28 employees included in classification 203. Appendix F. Of these 28 employees, 16 did not work for JPM during the period after June 24, 1987.

190. Accordingly, based on the evidence adduced concerning the destination of waste prior to June 24, 1987, I find that the Secretary's compliance officer's transcription sheets show that none of these employees transported waste out-of-state.

191. Of the remaining twelve employees, 10 of the employees' transcription sheets show that these employees were always compensated at rates less than $50.00 per trip. These employees are Robert West, John Ward, Joseph Tate, John Frank Preskop, Robert Mizwinski, Micheal Merkitch, Michael Lloyd, Charles Brown, and Nicholas Antidormi.

192. It is undisputed that defendants paid drivers $150.00 per trip for driving to West Virginia.

F.2d 1141, 1143 (3d Cir.1983); *Donovan v. Frezzo Brothers, Inc.,* 678 F.2d 1166 (3d Cir.1982).

9. The parties stipulated that earlier versions of these sheets correctly reflected the wages paid to the employees as transcribed from the employers' payroll records. A comparison of the transcription sheets for classification 203 employees submitted during trial, and stipulated to as correctly reflecting the number of trips by the employees and the amount of wages paid with the classification 203 sheets submitted post-trial as part of Appendix F reveal no significant deviations in these critical figures. Thus, I find that the number of trips reflected and the amount of wages paid for classification 203 employees are correctly reflected in Appendix F for those employees.

193. The employers' payroll records do not reflect that these 10 employees were ever paid a rate even roughly equivalent to the wage paid for trips out-of-state. Further, the rates paid these employees were generally $40.00 or $24.00 per trip, equal to the rates defendants paid for trips to landfills within Pennsylvania.

194. Therefore, I find that these 10 employees did not transport waste out-of-state.

195. The computation sheets for two classification 203 employees, Cliff Snyder and Frederick Moyer, reflect a number of trips at rates less than the $150 per trip interstate rate.

196. However, Snyder's transcription sheet shows that for the week ending November 18, 1987, he was paid $450 for three trips, the $150.00 per trip rate. Moyer's sheet shows that beginning in the week of December 2, 1987, he was compensated at the $150.00 per trip rate.

197. Given the evidence available, therefore, I find that Snyder and Moyer began driving interstate on November 18, 1987 and December 2, 1987 respectively. The wage transcription sheets do not reflect overtime wages due these employees after these dates.

198. Accordingly, I find that the computation sheets submitted by the Secretary as Appendix F correctly reflect that JPM classification 203 employees were not engaged in the interstate transportation of waste for periods when the sheets show overtime wages are due classification 203 employees.

199. Concerning Hoch Sanitation employees except Northern Division employees, the sparse evidence shows that at some point between late June, 1987 to December, 1988, waste from the Hoch division was transported to the JPM facility at Souderton. N.T., 3/21 at 101, 3/27 at 37.

200. The former supervisor of the Hoch Allentown facility from April to October, 1987 credibly testified that "most of the

time," while he was supervisor, waste was dumped at the Keystone Landfill. N.T., 3/7 at 60.

201. No records were introduced which show the destination of Hoch waste for the period, despite Pat Mascaro's admission that such records were available. N.T., 3/27 at 45.

202. Accordingly, given the failure of defendants to provide such records, based on the evidence available, I find that Hoch Sanitation waste, other than Northern Division waste, was not transported out-of-state before September 30, 1987.

203. This finding is consistent with the credible testimony of the former supervisor, and with the credible testimony of Pat Mascaro.[10] Mascaro testified that beginning in June, 1987, thirty-five percent of the defendants' waste was transported to destinations out-of-state. N.T., 3/27 at 11. During the period from August to October, 1987, use of the West Virginia landfill increased substantially. N.T., 3/27 at 19–20.

204. Concerning the Northern Division, Mascaro testified that waste from this division continued to be dumped at the Keystone landfill until it closed at the end of November, 1987. N.T. 3/27 at 10.

205. Mascaro's testimony on this point conflicts with that of the former operations manager of the Northern Division who testified that waste from that division was sent to Souderton during the time he was manager, N.T., 3/30 at 13. However, as I have already found other credibility problems with the testimony of the former manager, I credit the testimony of Mascaro on this point.

206. Accordingly, I find that Northern Division waste was not transported in interstate commerce before November 30, 1987.

207. Thus, Mascaro's testimony concerning the gradual increase of the transportation of defendants' waste in interstate

---

**10.** Mascaro initially testified that "90–something percent" of the JPM and Hoch Sanitation waste was transported to out-of-state between June and October. N.T., 3/27 at 10. However, his more detailed version was that the amount of waste gradually increased during the period, ending with 99 percent in December. *Id.* at 11. I find that the evidence available shows that a gradual increase during the period occurred.

commerce is consistent with these findings, summarized as follows:

207A. JPM waste began to be transported in interstate commerce, with the exception of that transported by classification 203 drivers, in June, 1987. Therefore, JPM employees, other than classification 203 employees, were a part of a continuous stream of interstate commerce beginning June 24, 1987.

207B. Hoch waste began to be transported in interstate commerce, with the exception of Northern Division waste, in October, 1987. Therefore, Hoch Sanitation employees, other than Northern Division employees, were a part of a continuous stream of interstate commerce beginning on or about September 30, 1987.

207C. Northern Division waste began being transported in interstate commerce in November, 1987. Therefore, Northern Division employees were a part of a continuous stream of interstate commerce beginning on or about November 30, 1987.

208. Concerning Lackawanna Transport employees, the evidence is even more difficult to distill.

209. In December, 1988, defendants opened a baling facility at Omrod, Pennsylvania. It is undisputed that since that time, Lackawanna Transport employees have been engaged in a continuous stream of interstate commerce.[11]

210. Before that time, the evidence shows that many Lackawanna drivers drove only to the G.R.O.W.S. landfill in Morrisville, Pennsylvania. N.T., 2/22 at 79; 3/20 at 38, 78; 3/23 at 32.

211. Pat Mascaro credibly testified that from the time the Keystone landfill closed in November, 1987 until December, 1988, Lackawanna Transport employees transported waste from Abington and Lower Merion "[p]rincipally to G.R.O.W.S." in Pennsylvania. N.T., 3/23 at 123; 3/27 at 2.

212. However, some Lackawanna employees occasionally did transport waste to West Virginia and other out-of-state locations. These employees were paid $150 per trip. N.T., 3/20 at 8, 29, 37–38; 3/23 at 51; DX 16 (West Virginia landfill log sheet for November 5, 1987 showing 2 loads transported by "Lacawana [sic]"). Further, the West Virginia landfill log sheets show numerous loads were delivered by Lackawanna drivers. DX 16.

213. The defendants' payroll records show that Lackawanna Transport employees began hauling to out-of-state landfills in December, 1987, and ceased these trips after April, 1988. GX 22, GX 27.

214. During 1988, some Lackawanna employees hauled waste to the Buckhorn facility where it was baled. Employees were paid $50.00 per trip to Buckhorn. N.T., 3/21 at 73; 3/23 at 12, 25, 47.

215. There is no direct evidence to suggest that the waste taken to the Buckhorn facility was transported in interstate commerce. The sole indirect evidence of the destination of the waste transported through the Buckhorn facility is the testimony of Pat Mascaro that nearly all waste transported by defendants after 1988 is transported out of Pennsylvania.

216. This evidence is not sufficient to find that the waste transported to Buckhorn before the end of 1988 was transported in interstate commerce.

217. Accordingly, I find that the only Lackawanna employees who hauled waste to out-of-state landfills are reflected on the employers' payroll records during the period prior to December, 1988. The evidence does not establish that Lackawanna Transport employees were part of a pool of employees who participated in the transportation of goods in a stream of interstate commerce. This conclusion is consistent with Mascaro's testimony that Lackawanna Transport employees "principally" transported waste within Pennsylvania during this period.

218. For employees who are shown to have transported waste out-of-state prior to

11. During trial, counsel for the parties agreed that the Secretary was not seeking wages for Lackawanna employees after December, 1988.

December, 1988, the Secretary's compliance officer calculated backwages and excluded the four month period following the employee's last trip out-of-state. N.T., 3/30 at 11. The exclusion of the four month period is reasonable.

219. There is no direct evidence that yard laborers at these facilities are engaged in activities related to the safety of interstate commerce. The direct evidence shows that yard laborers park trucks, push trash into compactors, and switch trailers. N.T., 3/21 at 4–6; 3/23 at 38.

220. However, it is logical to infer that these employees are involved in the packing of the trucks that go out-of-state. Simply put, somebody must load the trucks, and there is no other category of employee who could possibly be responsible for that task.

221. Accordingly, I find that the yard laborers were engaged in activities that affect the safety of interstate commerce during the periods described above.

## VIII. Evidence Related to the Liquidated Damages Claim

222. Defendant Hoch Sanitation was investigated on one prior occasion by the Department of Labor, Wage and Hour Division. N.T., 3/13 at 55–59. That investigation concluded in January, 1986 and encompassed the period from August, 1985 to December, 1985. The investigation resulted in the payment of approximately $1,100.00 in minimum wage and overtime backwages paid to an undetermined number of employees.

223. The violations of minimum wage and overtime wage laws resulted from defendants payment of bonus money when overtime wages should have been paid.

224. This precise violation is the basis for a part of the violations described above. Findings 110, 111, 116.

225. The Secretary's compliance officer who handled the investigation discussed the violations with the manager of the facility, who was defendants' agent. He explained the proper methods for computing overtime wages, which defendants' agent apparently understood. N.T., 3/13 at 56–57.

226. Defendants' were provided with a reference guide of the Fair Labor Standards Act and Regulation 778 which details proper methods for computing overtime wages. Id.

227. Immediately before the investigation which lead to the instant action, Department of Labor Compliance Officer Joseph Dietrick spoke with Hoch Sanitation office manager Virginia Travitsky at her request. N.T., 3/16 at 21.

228. Dietrick informed Travitsky of the problems related to the day rate method of pay, and the defendants' bonus system for additional runs. Id. at 22. Travitsky told Dietrick she understood his explanation. Id. at 23.

229. The very next day, Dietrick was contacted by the contract manager for the company, Richard Sheppard. Sheppard's questions of Dietrick made it clear to Dietrick that defendants desired to maintain a set amount of pay per individual per week, regardless of the total number of hours each employee worked during the week. Id. at 22–24. Dietrick informed Sheppard that the methods he was proposing did not comply with the Fair Labor Standards Act. Id. at 24–25.

230. After the investigation which lead to instant action began, Dietrick contacted defendants to obtain time records for Northern Division employees. N.T., 3/16 at 52. Dietrick initially contacted Travitsky who referred him to a Mr. Clark, defendants' controller. Clark referred him back to Travitsky. Travitsky referred him to Ralph McConnell, who was then in charge of the Northern Division. Unable to reach Ralph McConnell, Deitrick spoke to Mrs. McConnell who told Dietrick that there were no time cards for Northern Division employees and that the time sheets were completed by the employees and sent to Hoch in Allentown. She referred him back to Travitsky. Id. at 52–53. Dietrick never received the records, which apparently were the cards produced as DX 5.

231. JPM was investigated by the Department of Labor, Wage and Hour Division on six occasions, excluding the investigation which lead to the instant action, over the twelve year period prior to that relevant to this suit. DX 8. The undisputed results of those investigations were as follows:

231A. The first investigation occurred between July, 1976 and March, 1977. The investigation resulted in the payment of $18,475.00 in overtime backwages to 46 employees.

231B. The second and third investigations occurred between October, 1978 and January, 1979. The investigation resulted in $906.00 in minimum wage and overtime backwages paid to 9 employees at the Souderton facility and $1,102.00 in overtime backwages paid to 1 employee at the Bristol, Pennsylvania location.

231C. The fourth investigation occurred between January, 1981 and December, 1981. The investigation resulted in $256.00 in minimum wage and overtime violations paid to 7 employees. Recordkeeping violations were also found.

231D. The fifth investigation occurred between May, 1981 and February, 1983. The investigation found one violation of Child Labor laws.

231E. The sixth investigation occurred between February, 1983 and October, 1984. N.T., 3/13 at 60; DX 8. The investigation resulted in $22,961.00 in minimum wage and overtime backwages paid to 100 employees. Recordkeeping violations were also found.

232. James Bundick, an experienced Compliance Specialist with the Department of Labor, conducted the sixth investigation of JPM. N.T., 3/13 at 59–69.

233. Bundick found violations for employees paid by the trip, by the day, and by the fluctuating work week method. Recordkeeping violations for failing to keep records of all hours worked during a week by employees were also found. Id. at 61–62.

234. Bundick met with Pat and Joe Mascaro to discuss the violations he found. He informed the Mascaros that employees paid by the trip and by the day must be paid overtime premium wages for hours worked over 40 during a week. Id. He informed them that the premium wage must be time and one-half the regular rate of pay for hours over 40. Id. Bundick informed the Mascaros that he found minimum wage violations and what was necessary to prevent such violations from re-occurring. Id. at 63.

235. Bundick informed the Mascaros of the recordkeeping violations he found, and that it was their responsibility as employers to accurately record all hours worked by employees and to keep such records. Id. at 64.

236. At the conclusion of the investigation, Bundick and another compliance officer held a final conference with Pat and Joe Mascaro and discussed in great detail their findings and the necessary steps for the defendant to comply with the law. Id. at 64–65.

237. Francis McGrath, Assistant Regional Director of the Department of Labor, Wage and Hour Division also met with Pat and Joe Mascaro, and their attorney, Edward Bresnan, at the close of Bundick's investigation. N.T., 3/16 at 3–4. Subsequent to the meeting, McGrath sent a three page letter detailing the discussion during the meeting in great detail. Id. at 4; GX 28. The letter was sent to JPM and Bresnan. The letter very precisely details the proper application of the fluctuating work week method to the Mascaros' company.

238. It concludes: "I want to emphasize the importance once again of accurate daily and weekly hours. Without them Mascaro or any employer is going to have problems; without bonafide records the burden of proof shifts to the employer." GX 28 at 3.

239. Shortly after the conclusion of Bundick's investigation, the Department of Labor received new complaints about JPM incorrectly keeping time records. McGrath had another discussion with Mike Mascaro, which he noted in a letter to Bresnan. N.T., 3/16 at 6; GX 29. The Mascaros

were again informed of the importance of keeping accurate time records. GX 29.

240. Department of Labor, Wage and Hour Division Compliance Officer Mark Price conducted an investigation of JPM in 1987 which forms the basis for part of the instant action. N.T., 3/13 at 71. The violations Price found are identical to the violations Bundick and McGrath discussed with defendants in 1985. GX 4 through 10.

241. During the course of Price's investigation, he attempted to meet with Pat Mascaro, Robert Clark, defendants' controller, and the payroll record clerk. N.T., 3/30 at 36–39; GX 30: GX 30A. After repeated oral requests to do so were unsuccessful, on February 26, 1987, Price wrote to Clark and highlighted his problems during the investigation. GX 30.

242. Clark responded by letter dated March 2, 1987. DX 9. Price wrote back, again requesting the interviews. GX 30A. By letter dated March 23, 1987, Clark requested that Price contact him to set up the meeting with the Mascaros. DX 9 at 3. Price's investigation notes show that he then contacted Clark five times between April 1 and April 24. GX 31.[12]

243. On April 24, 1987, Clark informed Price that Pat Mascaro would be unavailable for the "foreseeable future." GX 31.

244. Pat Mascaro testified that he was aware of and recalled the previous investigations. N.T., 3/23 at 99–104.

245. Mascaro further testified that he believed JPM transfer station tractor-trailer drivers, classification 203, were paid on the fluctuating work week basis. He learned that the method of payment of these employees was not actually in conformity with the law as a result of Price's investigation. He further testified it was the payroll clerk's responsibility to compute wages for the employees. *Id.* at 106–10.

246. After he learned of the problems with the method of payment, defendants

converted to a straight per trip rate. *Id.* at 111. Mascaro testified that he understood he "was permitted to do that." *Id.*

247. I find Mascaro's testimony on this issue utterly unbelievable. He was informed in 1985 by Bundick and McGrath that a per trip rate was not acceptable. He was repeatedly informed that the company was responsible for keeping adequate time records.

248. Therefore, defendants refused to follow the advice given to them by the Department on numerous occasions.

249. The time cards defendants eventually produced are inaccurate and highly suspect. Findings 129–134.

250. Moreover, defendants refused to disclose the existence of the related company, Lackawanna Transport, until counsel for the Secretary learned of its existence at the opening of trial. N.T., 2/21 at 89–93 (comments of counsel).

251. Even after the complaint in the instant action was filed, defendants continued to ignore the recordkeeping requirements of the Act. Defendants' general manager, Pat Thornhill, testified that JPM keeps no record of hours worked for tractor-trailer or rear-end loader drivers. N.T., 3/21 at 48–51.

252. The individual Mascaro defendants' failure to monitor or change the methods the companies use to pay employees, after no less than seven prior investigations, is probative of a willful intent to violate the Act.

253. As a result of the pay practices described above, defendants' have failed to pay certain employees the minimum wage rate of $3.35 per hour.

## DISCUSSION

### I. Post–Trial Motions

#### A. The Secretary's Motion to Amend

■ The Secretary moves to amend the complaint pursuant to Fed.R.Civ.P. 15(b).

---

**12.** GX 31 is a redacted version of Price's investigation notes, which was admitted as a recorded recollection. Fed.R.Evid. 803(5). During trial, defendant questioned the redaction. After reviewing the unredacted version of the notes in camera, I ruled that the redactions were proper and necessary to prevent the disclosure of Price's notes of conversations with confidential informants, and his Department of Labor superiors and Solicitor's Office personnel. The original was placed under seal and also made part of the record as GX 31.

She desires to add Lackawanna Transport Company, Inc. as a defendant to this action and to include Lackawanna employees as a Schedule C to the complaint, allowing them to recover backwages for violations of the FLSA along with other employees of defendants. Her argument is based, in part, on defendants' failure to acknowledge the existence of Lackawanna as one of the companies owned and controlled by the individual defendants throughout discovery. Once trial began, one of the Secretary's witnesses produced his paycheck stubs. The stubs denoted the existence of Lackawanna. At that point, the Secretary requested records for Lackawanna. N.T., 2/21 at 89–93.

Defendants argue in response that they would suffer prejudice if the amendment was allowed and that Lackawanna was a separate corporate entity until January 1, 1987. They further contend that the proposed amendment will not merely add employees and increase the amount of damages they may be liable for, but that prejudice will result from a lack of time in which to build a defense to allegations pertaining to Lackawanna employees.

Rule 15(b) states:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Fed.R.Civ.P. 15(b).

Here, defendants object to the amendment. Therefore, the third sentence of the Rule is relevant. I begin with the scope of the complaint. Filed on February 11, 1988, the complaint names Solid Waste Services, Inc. as a defendant, as well as Mike and Pat Mascaro. It is not disputed that Lackawanna Transport, Inc. was formed by the individual Mascaro defendants in late 1985 or early 1986, N.T., 3/23 at 76–77, and merged, along with JPM and Hoch at the same time into Solid Waste. *Id.* at 77–78. Mike Mascaro ran the operations of Lackawanna at all times relevant to this lawsuit. Lackawanna shared the same controller. Its employees were paid through the central headquarters, and the payroll system was common among all defendants and Lackawanna.

The complaint alleges that the "business activities of the defendants ... are related and performed through unified operation or common control for a common business purpose and constitute an enterprise within the meaning of Section 3(r) of the Act." Complaint, at 3, ¶ VII. The violations alleged in the complaint are the same type of violations that the Secretary alleges against Lackawanna. Further, and importantly, in the prayer for relief, the complaint states

Additional amounts of money and liquidated damages may be owed to certain present and former employees ... [for] violations continuing after June 1987 and to persons presently unknown to plaintiff for the period covered by this Complaint.

Complaint at 6–7.

During discovery, the Secretary moved to compel production of documents, which included, *inter alia,* a request for "all documents, including but not limited to, payroll records ... which would show amounts paid to individuals for work performed for defendants in the years 1985 through 1988." "Defendants" at that time included the individual Mascaros, and Solid Waste. It is beyond comprehension how defendants could not construe this request to

include Lackawanna employees, at least for the period beginning January 1, 1987, the date Lackawanna became a division of Solid Waste. Nonetheless, no documents concerning Lackawanna were disclosed by defendants until after the Secretary learned of its existence on the first day of trial.[13]

In *Hodgson v. Colonnades, Inc.*, 472 F.2d 42 (5th Cir.1973), the court faced a situation remarkably similar to the instant case. The district court refused to allow an amendment of the Secretary's complaint seeking backwages and injunctive relief where the amendment would double the number of employees included in the action and increased the damages five-fold. The Fifth Circuit held the denial of the amendment was an abuse of the district court's discretion under Rule 15(b).

> An amendment of a complaint will be allowed "unless the opposing party is actually prejudiced." This prejudice, must "put the objecting party to some serious disadvantage," and "it is not enough that (the objecting party) advances an imagined grievance or seeks to protect some tactical advantage." Thus, the party opposing the amendment "must be seriously prejudiced" in his "defense on the merits."

*Id.* at 48.

In an attempt to distinguish the instant case from *Colonnades*, defendants argue that Lackawanna was a separate company for which they did not prepare a defense. This argument is even more difficult to fathom than why Lackawanna was not disclosed during discovery. Lackawanna maintained its payroll under the same personnel and payroll system as the other defendants to this action. Lackawanna shared employees with other Solid Waste divisions. The notion that it was an entirely separate entity is frivolous—at all times

relevant to this action it was owned and controlled, directly or indirectly, by individuals named in the original complaint.

As for the argument that defendants had no time to prepare a defense for Lackawanna employees, I note that trial stretched over a five week period, and testimony actually was heard on eleven days. I repeatedly granted continuances to allow counsel to prepare for newly discovered evidence or to meet other commitments.[14] The Secretary made clear her intent to include Lackawanna as a defendant on the first day of trial, February 21, 1989. I allowed her to call Lackawanna employees after her direct case was completed to allow time to prepare the case against Lackawanna. Defendants never sought a continuance to prepare a defense for Lackawanna. There is no merit to defendants' claim of prejudice by not having time to prepare a defense. They never asked for such time.

Finally, the claims concerning the Lackawanna employees are brought under the same provisions of the FLSA as were the claims against all other defendants. Apart from the factual differences relative to the locations where drivers picked up and delivered waste,

> [t]he issue on this point was really one of mathematical computation. [Defendants'] had the records in its possession. The identity of the employees and their work hours were there set forth.

*Colonnades*, 472 F.2d at 48.

Unfortunately, here, defendants possessed no records of hours worked by Lackawanna employees, although it was Solid Waste's and the Mascaros' obligation to maintain such records. Solid Waste had the records of the Lackawanna employees'

---

**13.** I also note, as the Secretary points out in the instant motion, that certain employees who were included in the schedules attached to the original complaint were employees of defendants and Lackawanna. Thus, it is even further beyond comprehension why defendants did not disclose the existence of Lackawanna when they provided information concerning these employees. In view of the allegations of the complaint and the specific request for documents which clearly included all employees of Solid Waste, I conclude that defendants' failure to disclose information pertaining to Lackawanna is perilously close to bad faith conduct.

**14.** At one point, trial was continued more than three days to allow counsel for defendants to travel to Ohio to represent defendants in matters before the Ohio courts.

identity, but failed to disclose them despite the request of the Secretary.

Therefore, I conclude the delay in seeking the amendment was not occasioned in any way by the Secretary. Defendants suffer no prejudice from the amendment which can be considered undue. The motion to amend will be granted.

### B. Defendants' Motion for Directed Verdict

At the close of the Secretary's direct evidence, defendants moved for a direct verdict of the Secretary's claim for liquidated damages in an amount equal to the backwage award under section 16(c) of the Act. Defendants argue that they were entitled to a jury trial because of the existence of this damage claim. *Defendants did not raise this issue during pretrial proceedings, but waited until the middle of trial and the close of the Secretary's evidence.*

Again, I begin with the complaint. Paragraph I of the complaint invokes this Court's equitable jurisdiction under section 17 of the Act.[15] Complaint at 2, ¶ I. In the prayer for relief, the complaint seeks a permanent injunction prohibiting further violations of sections 6, 7, 11, 12, 15(a)(2), 15(a)(4) and 15(a)(5) of the Act "and pursuant to Section 16(c) of the Act, an award of liquidated damages equal in amount to the backwages found due by the Court." Complaint at 6. Section 16(c) of the Act, 29 U.S.C. § 216(c), authorizes the Secretary to supervise the payment of unpaid minimum or overtime wages and "to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages."

■ Defendants vigorously urge that legal relief under section 16(c) is not avail-

able under the Court's equitable jurisdiction provided for in section 17. Therefore, they contend, liquidated damages in this action cannot be awarded without a jury trial as a matter of right. After noting that cases relied on by defendants for this proposition were not brought under the current version of section 16(c),[16] the Secretary concedes that defendants have a right to a jury trial under the current version of section 16(c). *See McLaughlin v. Owens Plastering Co.,* 841 F.2d 299 (9th Cir.1988); *Brock v. Superior Care, Inc.,* 840 F.2d 1054 (2d Cir.1988).

As succinctly summarized by the Ninth Circuit,

> the Secretary [is] free to seek equitable relief under section 17, legal relief under section 16, or *both, as she chooses to do here.* ... The Secretary may not bring an action at law and then deny the defendant a jury trial by attempting to characterize the action differently.

*Owens Plastering,* 841 F.2d at 301.

■ The Second Circuit has interpreted the availability of liquidated damages more restrictively. The *Superior Care* court held that the Secretary's failure to invoke the court's jurisdiction under section 16(c) precluded the Secretary from seeking liquidated damages, "whether or not [the Secretary's] complaint could be viewed as seeking liquidated damages under section 16." 840 F.2d at 1064. However, critical distinctions between *Superior Care* and the instant case exist.

In *Superior Care,* "[t]he complaint ... alluded to the possibility of liquidated damages, although it did not mention section 16 of the Act, which authorizes such a remedy." *Id.* at 1058, 1063. Here, the complaint plainly cites section 16(c) of the Act. Further, "[p]rior to trial, Superior Care

---

**15.** In relevant part, 29 U.S.C. § 217 (1982) provides:

The district courts ... shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due under this chapter. ...

**16.** Defendants rely in part on *Hodgson v. Wheaton Glass Co.,* 446 F.2d 527, 534 (3d Cir.1971). This decision was based on section 16(c) as it stood before the 1974 amendments, which authorized the Secretary to seek liquidated damages. *Wheaton Glass,* therefore, has no bearing on the current version of section 16(c).

filed a motion *in limine* seeking to exclude any evidence pertaining to liquidated damages on the theory that the Secretary had failed to proceed under the section authorizing such an award." *Id.* at 1063.

In the instant case, defendants made no mention of this issue at any time prior to moving for the directed verdict at the close of the Secretary's evidence. Defendants filed no motions *in limine;* their pretrial brief asserts a defense to liquidated damages on the merits, without noting their right to a jury trial.[17] The Secretary here has never opposed defendants' right to a jury trial on the liquidated damages issue. Thus, in my view, defendants have failed to exercise their rights and make a demand for a jury trial.

Under Rule 38(a), defendants were free to file a demand for a jury on the issue of liquidated damages. Fed.R.Civ.P. 38(a). While the demand should have been made within ten days of the filing of the answer by defendants, defendants could have sought a jury trial at a later date. Rule 39(b) provides in part, "notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion *upon motion* may order a trial by jury of any or all issues." Fed.R.Civ.P. 39(b). "A Rule 39(b) motion is necessary to re-

lieve a party from waiver; the court cannot grant relief on its own initiative." *Mesa Petroleum Co. v. Coniglio,* 629 F.2d 1022, 1029 (5th Cir.1980), *cert. denied sub nom., Lock v. Mesa Petroleum Co.,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987); *see* 9 Wright & Miller, Federal Practice & Procedure § 2334 at 112 (1971 ed.) ("The court may not grant a jury trial on its own initiative if neither side has requested that form of trial...."). Defendants' failure to move for a jury constituted a waiver of the right to a jury on the liquidated damages claim. Fed.R.Civ.P. 38(d). The motion for a directed verdict will be denied.

## II. Undisputed Issues [18]

### A. Defendant Corporations Constitute An Enterprise

Section 3(r) of the Act defines an enterprise as:

[T]he related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more business establishments or by one or more corporate or other organizational units....

29 U.S.C. § 203(r).

The regulations promulgated by the Secretary describes a "common business pur-

---

**17.** A miscommunication from my Chambers to counsel for defendants' office resulted in defense counsel not attending the final pretrial conference. Defendants cannot be faulted for failing to raise this issue at the final pretrial conference. However, defense counsel was fully advised of the results of the final pretrial conference by my law clerk, and of scheduling changes by the deputy clerk. In fact, defendants submitted additional pretrial proposed findings of fact and conclusions of law after the date of the conference. Nowhere is reference to a demand for a jury trial found.

**18.** The number of potential issues raised in this action is overwhelming. After careful review of the trial briefs and post-trial briefs submitted by the parties, the issues which are disputed may be discerned from those that are not. Setting aside factual disputes concerning the hours worked by employees, the primary disputed legal issues are (1) the scope of the interstate commerce exemption under 29 U.S.C. § 213(b)(1) as it applies to the business of defendants after June, 1987; (2) the sufficiency of the evidence introduced at trial to support find-

ings of violations of the overtime and record keeping provisions of the Act relating to certain classifications of employees and defendants' lunch break time deduction from hours worked; and (3) assuming that defendants' payroll practices did violate the overtime and minimum wage provisions, whether the employer has established that such violations were the result of a good faith attempt to comply with the law which would prohibit the award of liquidated damages and render a two year statute of limitations applicable to this action.

Essentially undisputed issues are (1) whether the individual defendants are employers within the meaning of 29 U.S.C. § 203(d); (2) defendants' operation constitutes an enterprise under 29 U.S.C. § 203(r); (3) defendants' employment of minors in hazardous occupations under 29 U.S.C. § 212; and (4) whether defendants' pay practices lead to violations of the minimum wage laws. The issue of minimum wage violations is closely intertwined with overtime wage violations and is discussed therewith.

pose" as activities "which are directed to the same business objectives or similar business objectives." 29 C.F.R. § 779.213. Ownership is a significant factor in determining "common control." 29 C.F.R. § 779.215. Corporations that are operated for a common business purpose, under a unified operation and common control constitute an "enterprise" under the FLSA. 29 C.F.R. § 779.220.

It is undisputed that prior to January 1, 1987, defendants Lackawanna, Hoch and JPM were separate corporations, owned and controlled by the individual Mascaros. The companies were engaged in the same business, and the stock of each corporation was held by a Mascaro, or a combination of the Mascaros. Although the evidence is not clear that all three companies were controlled from a centralized operation, it is beyond dispute that the individual Mascaros jointly coordinated the activities of the companies.

After the formation of Solid Waste on or about January 1, 1987, the companies were operated through a centralized headquarters. The separate operating divisions used the same controller and payroll systems. The business was operated for the unified purpose of performing waste disposal services. Therefore, at all times relevant to this action JPM, Hoch, Lackawanna and Solid Waste constituted an enterprise within the meaning of section 3(r) of the Act.

### B. Pat, Mike and Joe Mascaro Are Employers

Section 3(d) of the Act defines employers as "any person acting directly or indirectly in the interest of the employer in relation to an employee." 29 U.S.C. § 203(d). The definition of "employer" under the FLSA is viewed expansively. *Falk v. Brennan*, 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973). The boundaries of section 3(d) are "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its em-

ployees." *Donovan v. Sabine Irrigation Co., Inc.,* 695 F.2d 190, 194–95 (5th Cir.). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under [the FLSA] for unpaid wages." *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir. 1983). Under this standard, it is undisputed that Solid Waste, JPM, Hoch, and Lackawanna are corporate employers, and that Pat, Joe and Mike Mascaro are individuals acting as employers as that term is defined in the FLSA.

### C. Employment of Minors

Section 12(c) of the Act prohibits employers from employing "any oppressive child labor in commerce or ... in any enterprise engaged in commerce...." 29 U.S.C. § 212(c). Section 3($l$) permits the Secretary to define oppressive child labor for employees between the age of sixteen and eighteen years old. 29 U.S.C. § 203($l$). The Secretary promulgated regulations which state that "the occupations of motor vehicle driver and outside helper on any public road ... are particularly hazardous for the employment of minors between 16 and 18 years of age." 29 C.F.R. § 570.52(a). Further, an "outside helper" is defined as "any individual, other than a driver, whose work includes riding on a motor vehicle outside the cab for the purpose of assisting in transporting ... goods." 29 C.F.R. § 570.52(c)(3).

Defendants employed Troy Schenk, Vernon Wright, James Hardy, and Howard Reynolds as pickers on disposal vehicles at times when these individuals were under eighteen years of age. Findings 12, 13. It is undisputed that pickers load trash onto the disposal truck while the vehicle travels on public roads. The Secretary produced evidence that establishes beyond dispute that two of these employees were injured while traveling on the exterior of vehicles in the course of their employment. GX 24. Therefore, defendants employed minors in hazardous occupations constituting "op-

pressive child labor" and violated section 12(c) of the Act.

### III. Disputed Issues

#### A. Minimum Wage Violations and Lunch Deduction

Section 6 of the Act requires employers to pay employees engaged in commerce or employed by an enterprise engaged in commerce a minimum wage of $3.35 an hour. 29 U.S.C. § 206(a)(1). Section 7(a)(1) of the Act requires that employees who work longer than forty hours in a workweek be paid a rate not less than one and one-half times the regular rate of pay. 29 U.S.C. § 207(a)(1). Compensating an employee covered by the overtime provisions at a flat weekly rate, or on a salary basis, without the payment of overtime, violates section 7. *Overnight Motor Co. v. Missel*, 316 U.S. 572, 580, 62 S.Ct. 1216, 1221, 86 L.Ed. 1682 (1942).

In the instant case, defendants paid JPM employees in classifications 200, 201, 202, and 203 on a per trip basis. Hoch employees in classifications 303, 305 and 306 were paid on a day rate basis with additional bonus payments for additional work performed. Lackawanna employees in classifications 103 and 203 were paid on a per trip basis. Defendants do not seriously dispute that these methods of payment violated section 7 and section 7(e) of the Act which requires the inclusion of all renumeration in the regular rate of pay. 29 U.S.C. § 207(e); *see also* 29 C.F.R. §§ 778.200–778.224. Rather, as discussed further below, defendants' primary contention is that the Secretary's evidence is not sufficient to establish that employees worked hours over forty in a week.

■ However, one area of dispute should be discussed at this juncture. Defendants vigorously contend that the Secretary's claim for backwages resulting from defendants' practice of deducting 2½ hours per week for meal breaks from employees' hours worked is unfounded. The Secretary's regulations clearly provide that an employee must be completely relieved from duty for the time spent on the break to be deducted from the employee's wages. 29 C.F.R. § 785.19. "An employee cannot be docked for lunch breaks during which he is required to continue with any duties relating to his work." *Brennan v. Elmer's Disposal Service, Inc.*, 510 F.2d 84, 88 (9th Cir.1975); *Biggs v. Joshua Hendy Corp.*, 183 F.2d 515 (9th Cir.1950).

As in *Elmer's Disposal*, the primary issue at trial was the credibility of the 65 witnesses that testified. Not surprisingly, the defendants' witnesses testified primarily that employees generally took lunch breaks in which they were relieved from all duties. However, much of the defense evidence relates to time periods different from the evidence presented by the Secretary. There was specific, and nearly uniform, testimony from Secretary's witnesses that they were unable to take lunch breaks in order to complete work requirements. There was also frequent and credible testimony that the individual Mascaros actively discouraged employees from taking lunch. After observing the witnesses, and careful review of their testimony, I credit the testimony of the Secretary's witnesses over that of any defense witness who testified directly to the contrary.

Therefore, defendants' uniform deduction of lunch breaks from employee's hours worked was improper. The 2½ hours per week deducted should be included in employees' hours worked for purposes of computing how many hours per week employees actually worked.

#### B. Recordkeeping Violations

■ Section 11(c) of the Act provides that every employer "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him...." 29 U.S.C. § 211(c) (1982 & West Supp.1988). It is well settled that the employer bears the burden of keeping accurate wage and time records, and that the duty cannot be delegated to employees. *Williams v. Tri–County Growers, Inc.*, 747 F.2d 121, 127–28 (3d Cir.1984); *Castillo v. Givens*, 704 F.2d 181 (5th Cir.1983), *cert. denied*, 464

U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1988).

Defendants cannot dispute that they failed to keep any records for some employees. *E.g.*, JPM classifications 200, 203, Findings 27, 49. For other employees, the records kept were inaccurate. *E.g.*, JPM classifications 201, 202, 300, Hoch classification 306, Findings 38–40, 78, 129–134. Some employees regularly worked hours that were not included on their time cards. For most classifications, defendants failed to produce records that were accurate. The clearest example was the production of time cards for Hoch classification 306 employees, which defendants introduced in an effort to impeach the compliance officer's testimony concerning the inaccuracy of defendants' payroll records. DX 5. The time cards were facially unreliable. Finding 134. The time cards did not match the hours recorded on defendants' payroll records. Findings 131, 132. For front-end loader, roll-off and tractor-trailer drivers of JPM and Lackawanna, defendants merely estimated the hours each trip would require.

Therefore, the Secretary established that defendants failed to keep accurate records of hours worked for employees covered by the FLSA. *Williams*, 747 F.2d at 128 (estimating hours worked, and deducting hours for lunch breaks not taken violates section 11(c)).

### C. Overtime Violations

Section 7(a)(1) of the Act prohibits employers from employing any worker "for a workweek longer than forty hours unless such employee receives compensation … at a rate not less than one and one-half times the [employee's] regular rate" of compensation for hours worked in excess of forty during a week. 29 U.S.C. § 207(a)(1). The largest part of the Secretary's claim against defendants is for overtime wages due employees. This portion of the claim results from defendants' failure to maintain adequate records of hours worked and to compensate employees for hours actually worked.

The burden of proof to establish that overtime wages are due is well settled. In *Anderson v. Mount Clements Pottery Co.*, 328 U.S. 680, 686–88 [66 S.Ct. 1187, 1191–93, 90 L.Ed. 1515] (1946), the Court considered, *inter alia*, how an employer's failure to keep adequate records affects its obligation to abide by the minimum wage requirements of section 6 of the [Act]. The Court determined that an employee should not be penalized and an employer benefitted by the employer's failure to comply with its duty under section 11(c) to maintain accurate records. *Id.* The Court recognized that the employee has

> "… the burden of proving that he performed work for which he was not properly compensated. The remedial nature of [section 16(b) of the Act] and the great public policy which it embodies, however, militate against making an impossible burden for the employee."

*Id.* at 687 [66 S.Ct. at 1192]. Once an employee establishes that the employer's records are inadequate, the employee need only introduce enough evidence to support a reasonable inference of hours worked. *Id.* The burden then shifts to the employer to come forward with evidence to negate "the inference drawn from the employee's evidence." *Id.* at 687–88 [66 S.Ct. at 1192–93].

*Williams v. Tri–County Growers, Inc.*, 747 F.2d 121, 128; *see McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989); *Brock v. Seto*, 790 F.2d 1446, 1447 (9th Cir.1986).

■ Once the burden shifts to the employer, if the employer fails to show either the precise amount of hours worked by the employee or negate the reasonableness of the inferences drawn from the employee's evidence, "the court 'may then award damages to the employee, even though the result be only proximate.'" *Seto*, 790 F.2d at 1448, *quoting, Mount Clements Pottery*, 328 U.S. at 688, 66 S.Ct. at 1192.

■ First, defendants' post-trial brief argues that the Secretary's evidence was in-

sufficient to establish a "pattern or practice" of the precise number of hours worked for several classifications of employees. Defendants' argument misconstrues the allocation of the burden of proof. The failure to keep accurate records shifts the burden to the employer to negate the reasonable inferences which may be drawn from the employee evidence. Here, the testimony of the Secretary's witnesses and compliance officers clearly establishes that one result of defendants' failure to keep adequate records was the improper recording of hours worked for some employees. *E.g.,* Hoch Classification 306. For tractor-trailer and other truck drivers, defendants merely estimated the time that should be required to complete a trip between destinations. Defendants did not include the waiting and working time at either destination, the time caused by traffic delays, or the delay caused by equipment failure.

The Secretary also provided evidence through the testimony of compliance officers concerning their interviews with other, non-testifying employees. Defendants' exhibits 6 and 7 reflect the number of employees who did not testify but who were interviewed by the compliance officers. This type of testimony is admissible to "describe the methodology [used] in preparing the wage transcription and computation sheets." *Seto,* 790 F.2d at 1449; *Hodgson v. American Concrete Construction Co.,* 471 F.2d 1183, *cert. denied,* 412 U.S. 949, 93 S.Ct. 3007, 37 L.Ed.2d 1001 (1973); *Hodgson v. Humphries,* 454 F.2d 1279 (10th Cir.1972).

■ Defendants further attack the number of witnesses who testified for the Secretary from many classifications as insuffi-cient representative testimony to justify the award of backwages to all employees in those classifications. This argument also misapprehends the burden of proof. It is clearly established that representative testimony may support an award to non-testifying employees. *Ho Fat Seto,* 850 F.2d at 589; *Donovan v. Bel–Loc Diner, Inc.,* 780 F.2d 1113, 1116 (4th Cir.1985).

The effect of defendants' argument, if correct, would be to establish a requirement that the court must hear evidence from some unknown number or percentage of employees in each employment classification before it could find that all employees in the class were entitled to a backwage award. Such a *per se* rule presents a host of practical problems. For example, in this case, with the number of different classifications and the substantial differences in the number of employees in each class, a mammoth trial would result. A total of 65 witnesses testified in this case; the documentary evidence submitted by the parties stands several feet high.[19] To the extent defendants' witnesses were credible, their testimony often did not conflict substantially with the Secretary's witnesses. After careful review of the eleven volumes of trial transcript, I conclude that the findings above would not be substantially altered if more witnesses were presented. I, therefore, reject defendants' position that the Secretary's evidence fails to establish a *prima facie* case or provide sufficient representative testimony from which reasonable inferences of hours actually worked may be drawn.[20]

■ Defendants' remaining contention with respect to the overtime violations is that their evidence sufficiently rebutted the

---

**19.** I note that for Hoch employees, except classification 306, the Secretary's computation of hours worked is derived from defendants' payroll records. Testimony from employees in these classifications supports the findings pertaining to the deduction of lunch breaks not taken. Regarding JPM, Hoch Northern Division, and Lackawanna, the Secretary presented thirty witnesses, and seeks backwages for approximately 320 employees.

**20.** I note the number of other cases in which the evidence of a small, and sometimes very small, percentage of employees was found sufficient to support awards to almost all of a defendant's employees. *See, e.g., Donovan v. Simmons Petroleum Corp.,* 725 F.2d 83 (10th Cir.1983); *Donovan v. Burger King Corp.* 672 F.2d 221 (1st Cir.1982); *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 472 (11th Cir.1982); *Hodgson v. Humphries,* 454 F.2d 1279; *Donovan v. Sovereign Security Ltd.,* 94 Lab.Cas. (CCH) ¶ 34,219 (E.D.N.Y.1982); *Marshall v. National Freight, Inc,* 87 Lab.Cas. (CCH) ¶ 33,839 (D.N.J.1979).

Secretary's evidence for many classifications to an extent sufficient to enable me to conclude that the inferences the Secretary suggests are unreasonable. Again, the effect of defendants' argument would be a *per se* rule: the court could either accept the inferences the Secretary suggests, or reject plaintiff's case entirely and enter judgment for defendants. I decline to adopt this approach.

In instances where the Secretary's evidence did not support the total number of hours suggested by the compliance officers, the findings of fact make adjustments based on reasonable inferences from the evidence adduced at trial. For many of the classifications, the Secretary's computations of hours actually worked and backwages due were reasonable. In the few instances where the Secretary's computations were not consistent with the hours reflected by the evidence at trial, I have rejected the Secretary's computations, and will require the submission of backwage computations based on the findings of fact, *supra*.

■ Lastly, I mention the nature of defendants' witnesses. In many instances, defendants' witnesses were current employees, some of whom recently became management employees. These employees have obvious credibility problems. *See Ho Fat Seto*, 850 F.2d at 589. Other defense witnesses were not employed at times relevant to this action. When the evidence of these witnesses is deleted and the remaining *credible* testimony of defendants' case is considered, there is no great inconsistency in the evidence.

I briefly review defendants' employee evidence. Defendants' witnesses from JPM testified primarily to hours worked after January, 1988, a period which is irrelevant to this action. Defendants presented no evidence from Hoch classification 306 employees, the only Hoch classification for which backwages are sought based on pattern or practice testimony. Defendants presented two Lackawanna/JPM tractor-trailer drivers. The testimony of John Smith was not credible; the testimony of Thomas Reese supports the Secretary's evidence.

After considering the inconsistencies in the evidence, and formulating the findings accordingly, the evidence permits determination of hours worked, and, therefore, backwages due with reasonable accuracy. "Unless the employer can provide accurate estimates [of hours worked], it is the duty of the trier of facts to draw whatever reasonable inferences can be drawn from the employees' evidence...." *Mount Clements Pottery*, 328 U.S. at 693, 66 S.Ct. at 1195. Defendants' credible evidence most assuredly does not rebut the Secretary's case. Therefore, I conclude that defendants violated section 7 of the Act and failed to pay overtime wages for hours worked as detailed in the findings of fact, *supra*.

### D. Statute of Limitations

■ Although no statute of limitations was expressly included in the FLSA as originally adopted in 1938, in the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 216, 251–262, Congress enacted a two year limitations period for actions under the FLSA. In 1966, Congress modified the limitations period to allow for a three year period for "willful" violations.

The Supreme Court recently stated "[o]rdinary violations of the FLSA are subject to the general 2 year statute of limitations. To obtain a 3 year exception, the Secretary must prove that the employer's conduct was willful...." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S.Ct. 1677, 1682, 100 L.Ed.2d 115, 124 (1988). The Secretary, therefore, must prove "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute," *id.* at 133, 108 S.Ct. at 1681, 100 L.Ed.2d at 123, to seek relief for violations three years prior to the filing of the complaint. Further, "neither an employer's good faith nor his ignorance of the governing statutes or regulations precludes a finding of willfulness." *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 196 (5th Cir.1983); *Hill v. J.C. Penney Co.*,

*Inc.,* 688 F.2d 370 (5th Cir.1982); *Brennan v. Heard,* 491 F.2d 1 (5th Cir.1974).

The Secretary's evidence more than adequately proves defendants knew or should have known of the requirements of the FLSA. Defendant companies were investigated on seven occasions before this suit was commenced. The Secretary showed that defendants had been repeatedly informed about the problems which resulted from defendants' wage computation methods. Defendants were told, orally and in writing, of the requirements of the FLSA. Employee witnesses credibly testified that they inquired of the individual defendants about lunch breaks and methods of payment. Defendants' responses were clear. *E.g.,* "[W]e don't take lunch breaks around here." However, defendants continued to deduct wages from employees for lunch breaks.

During the course of the investigation which preceded this action, Compliance Officer Dietrick credibly testified that he was, to say the least, given the proverbial "runaround" when he attempted to locate Hoch classification 306 time records. Defendants, however, were able to produce such records when pressed by the Court. The records then proved to be thoroughly unreliable.

In sum, as further discussed below in connection with the award of liquidated damages under section 16(c) of the Act, the record is replete with evidence that defendants were repeatedly informed of what was necessary to comply with the FLSA. It also clearly shows that defendants made no serious attempt, much less a good faith attempt, to comply with the FLSA. Therefore, I conclude defendants willfully violated the FLSA, and a three year statute of limitations is applicable to this action.

## IV. *Defenses*

Apart from their challenges to the sufficiency of the Secretary's evidence, defendants assert only one defense. As discussed above, section 7(a)(1) of the Act requires employers to pay employees who work over forty hours during a work week one and one-half times the regular rate of pay. 29 U.S.C. § 207(a)(1). Section 13(b) of the Act exempts certain employees from the requirements of section 7(a)(1). Among those exempted are "[a]ny employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service [under 49 U.S.C. § 3102]." 29 U.S.C. § 213(b)(1). Thus, employees who are regulated by the Secretary of Transportation are automatically exempted from section 7 of the Act. 29 C.F.R. § 782.1. Such employees, however, are not exempted from the minimum wage provisions, section 6, of the Act. *Wirtz v. Pioneer Steel Co.,* 212 F.Supp. 945, 948 (E.D.S.C.1963).

Essentially, the Secretary of Transportation regulates classes of employees who transport property by motor vehicle and engage in activities directly affecting the safety and operation of motor vehicles transporting property on public highways in interstate commerce. 29 C.F.R. § 782.2. Defendants contend that *all employees of Solid Waste* are exempt from the overtime provisions of the Act beginning June 24, 1987, the date JPM first shipped waste in interstate commerce.[21] The Secretary does not contend that the exemption is not applicable to defendants, but takes the position that application of the exemption became applicable to the separate operating divisions of Solid Waste at different times. Thus, the critical legal issue is whether the exemption applies to all employees of defendant Solid Waste once one operating division commences the interstate transportation of waste, or whether the exemption should be applied to each operating division at the time the division begins interstate transportation.

I begin with the "well settled" principle that exemptions from the FLSA are to be narrowly construed against the employer.

---

**21.** Defendants' argument is that *all* employees were covered by the exemption from that date forward. I note, however, that concerning claims of the Secretary, defendants contend that the Secretary must introduce evidence of a pattern or practice for each *classification* of employee to prevail.

*Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815 (1959); *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945); *Guthrie*, 722 F.2d at 1143. It is the employer's burden to prove entitlement to an exemption. *Idaho Metal Works v. Wirtz*, 383 U.S. 190, 209, 86 S.Ct. 737, 749, 15 L.Ed.2d 694 (1966). The employer must clearly and precisely show that his employees fall within the scope of the exemption claimed. *Id.; A.H. Phillips v. Walling*, 324 U.S. 490, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

Turning to the terms of the exemption itself, "[t]he exemption is applicable to *any employee* with respect to whom" the Secretary of Transportation regulates working hours and conditions. 29 C.F.R. § 782.1(a) (emphasis added). "The exemption of an employee from the hours provisions of the [FLSA] under section 13(b)(1) depends on both the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). The employer must be subject to section 204 of the Motor Carriers Act, 49 U.S.C. § 3102, and the employee must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of ... property in interstate commerce...." *Id.*

How the exemption applies to defendants' employees is clearly stated in the regulation. Based on the principle that the exemption "depends not only upon the class to which the employer belongs but also the activities of the individual employee," the exemption does not apply to "truck drivers employed by a private carrier on interstate routes who engage in no safety-affecting activities of the character described [in the regulation] even though other drivers of the carrier on interstate routes were subject to the jurisdiction of the Motor Carrier Act...." 29 C.F.R. § 782.2(c)(2); *see Goldberg v. Faber Industries*, 291 F.2d 232 (7th Cir.1961).

 Thus, employees of private carriers who are engaged in "intrastate," as opposed to "interstate," commerce are not exempted from the overtime provisions of the FLSA. *Baird v. Wagoner Transportation Co.*, 425 F.2d 407, 413 (6th Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). Employees are exempt if the interstate work is shared indiscriminately and the employees form part of a "pool" of interstate drivers. *Brennan v. Schwerman Trucking*, 540 F.2d 1200 (4th Cir.1976). Further, employees whose duties related to interstate commerce are an "infinitesimal" portion of their work are not exempted from the FLSA. *Coleman v. Jiffy–June Farms, Inc.*, 324 F.Supp. 664, 669 (S.D.Ala.1970), *aff'd*, 458 F.2d 1139 (5th Cir.1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972), *overruled on other grounds, McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *see Kimball v. Goodyear Tire & Rubber Co.*, 504 F.Supp. 544, 548 (E.D.Tex.1980).

When applied to the facts of defendants' interstate transportation of waste, these principles render defendants' claim that all employees of Solid Waste were exempt from the overtime provisions of the FLSA manifestly incorrect. The Secretary does not contest that defendants' transportation of waste after June 24, 1987 was an activity involving interstate commerce. Thus, the issue is the timing of when the different employee classifications and operating divisions became involved in interstate commerce.

In her post-trial submissions, the Secretary concedes that defendants have met their burden of proof in establishing the exemption for JPM classifications 200, 201, and 202 employees who delivered waste to the Souderton yard after June 24, 1987. This concession is supported by the evidence adduced during trial. After that date, waste from the Souderton yard was delivered to Souderton for re-loading to travel to landfills in Ohio and West Virginia. The route slips and landfill logs provide proof that the waste was delivered to Souderton as part of a continuous movement in interstate commerce.

 Concerning JPM classification 203 tractor-trailer drivers, careful analysis of

defendants' payroll records and the wage transcription sheets shows that these employees were not involved in interstate commerce during the period for which the Secretary is seeking backwages, with the exception of two employees, Snyder and Moyer. However, the wage computation sheets submitted as Appendix F show that the Secretary does not seek overtime wages for the period in which they were involved in interstate transportation.

■ Although the evidence concerning Hoch Sanitation employees was not presented in a clear manner, there is sufficient circumstantial evidence in the record to conclude that Hoch employees, other than classification 306, were engaged in interstate commerce after September 30, 1987. In addition to vague testimony from former employees and a supervisor, this conclusion is supported by the landfill log sheets. Also, the credible testimony on the issue establishes that waste transported by Hoch classification 306 employees did not travel in interstate commerce until after November 30, 1987.

■ Defendants have failed to introduce any credible evidence to establish the destination of waste transported to the Buckhorn facility, and thus fail to establish the prerequisites of interstate destinations for waste transported to that facility.

■ Lastly, defendants have failed to establish that *all* Lackawanna employees were eligible for the exemption prior to December, 1988. Defendants' payroll records reflect that only certain Lackawanna employees made trips to out-of-state destinations before that time. For employees who were involved in the transportation of waste in interstate commerce, the Secretary does not seek wages for a four month period following the last trip interstate. This is more than reasonable. The conclusion that Lackawanna employees were not part of a pool of interstate drivers before December, 1988 is bolstered by Pat Mascaro's testimony that Lackawanna employees "principally" transported waste in Pennsylvania before that date.

## V. Injunctive Relief

■ The complaint seeks relief under both sections 16(c) and 17 of the FLSA. The Secretary seeks a restitutionary injunction including an award of liquidated damages as discussed above, and a prospective injunction.

> Once a finding of past due wages is made ... the district court's discretion to refuse the Secretary's request for a restitutionary injunction is limited, and must be tempered by considering whether the prerequisites for this remedy have been met and the policy reasons underlying Congress' enactment of the legislation have been fulfilled. Thus the court must ascertain whether an injunction commanding restitution of delinquent backpay furthers the FLSA's twin purposes of compensating injured employees, and of redressing a continuing public wrong by depriving a violator of any gains accruing to him through his violations, and protecting those employers who comply with the Act's wage requirements from having to compete unfavorably with those who do not.

*Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 197 (5th Cir.1983) (citations omitted).

The evidence establishes that the Secretary is entitled to a restitutionary injunction of backwages for minimum wage and overtime violations which were rampant through defendants' operations. In some cases, the wage computation sheets reveal that individual employees worked significant numbers of overtime hours and were not compensated adequately. Some employees are entitled to awards in excess of $1000 individually. From the scope of defendants' operations as detailed by the evidence at trial, it is clear to me that their business is substantial and profitable enough to support continuing and substantial expansion. Contributions to this profitability should not come at the expense of the individual employee who has not been paid a fair wage as defined by the FLSA. Therefore, I will compel the remission of wages to which employees are entitled.

## A. Liquidated Damages

Section 16(c) of the Act provides that an employer who violates the backwage provisions of the FLSA "shall be liable to the ... employees affected [for] ... an equal amount in liquidated damages." 29 U.S.C. § 216(c). Section 11 of the Portal–to–Portal Act, 29 U.S.C. § 260, provides the employer with a defense to an award of liquidated damages.

> Essentially, the defense provides that the district court has discretion to award no liquidated damages, or to award an amount of liquidated damages less than the amount provided by ... the FLSA, *if, and only if,* the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act.

*Marshall v. Bruner,* 668 F.2d 748, 753 (3d Cir.1982); *see Brock v. Claridge Hotel & Casino,* 846 F.2d 180, 187 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 307, 102 L.Ed.2d 326 (1988); *Williams v. Tri–County Growers, Inc.,* 747 F.2d 121, 129 (3d Cir.1984); *Guthrie v. Lady Jane Collieries, Inc.,* 722 F.2d 1141, 1149 (3d Cir.1983).

The employer bears the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose a verdict upon him more than a compensatory verdict." *Rothman v. Publicker Industries,* 201 F.2d 618, 620 (3d Cir.1953), *quoted in, Brunner,* 668 F.2d at 753. Good faith is a "subjective requirement, shown if the employer had 'an honest intention to ascertain and follow the dictates of the Act.'" *Williams,* 747 F.2d at 129, *quoting, Brunner,* 668 F.2d at 753; *see also Brock,* 846 F.2d at 187. "The reasonableness test is an objective one, which '[i]gnorance alone' will not satisfy." *Brock,* 846 F.2d at 187, *quoting, Brunner,* 668 F.2d at 753. If the district court believes the defense is proven, it must make specific findings to support not awarding liquidated damages. *Brock,* 846 F.2d at 187.

 However, "[i]f the employer fails to come forward with plain and substantial evidence to satisfy the good faith and reasonableness requirements, the district court is without discretion to deny liquidated damages." *Williams,* 747 F.2d at 129. On the record here, to find either of the elements of the defense fulfilled by defendants' evidence would be clearly erroneous.

 In addition to the evidence discussed above in connection with the prior investigations of defendants which found on more than one occasion the same type of violations that the investigations prior to this action also found, and the flagrant disregard of the recordkeeping requirements, there is evidence which hints at an intent to violate the Act. Defendant Pat Mascaro clearly testified that he knew the basic requirements to pay employees under a legal fluctuating work week method. However, defendants' payroll records showed that these requirements were not met. Further, the amounts actually shown on the records reflect that defendants made a conscious effort to mold a fluctuating work week method to conform to the amount of pay employees received under a per trip method.

Pat Mascaro's testimony on this issue was remarkable. After testifying that prior investigations of defendants found violations of the fluctuating work week method and that Deputy Regional Director McGrath had provided detailed information about the requirements of that wage computation method, N.T., 3/23 at 104–106, he testified that he "thought" tractor-trailer drivers for JPM were paid under the fluctuating work week method. *Id.* at 106. He then testified that *after* the investigation which lead to this action was concluded, he learned the actual method of paying these records did not comply. Mascaro testified that the manner for computing wages was "you know, a unilateral move on the part of the payroll clerk." *Id.* at 107. Mascaro then attempted to implicate a former employee as responsible for the violation. *Id.* at 107–11.

This is an attempt to hang responsibility for a flagrant violation on lower level employees. It is probative of a conscious at-

tempt to circumvent, or at least reckless disregard of, the requirements of the FLSA. Mascaro was specifically informed of the requirements of a proper method; he made no attempt to determine whether his company was complying with the law, although he knew that it had not done so previously. As an employer, he bears the responsibility for conforming the conduct of his personnel to the law.

Thus, the evidence shows, rather than an "honest intention to ascertain and follow the dictates of the Act," an intention either to "pawn off" responsibility for complying with the FLSA, or circumvent its requirements whenever possible. Defendants failed to show that the violations were the result of good faith.

Although that failure alone is sufficient to require an award of liquidated damages, I further conclude that defendants' conduct cannot meet the requirements of an objectively reasonable attempt to comply with the FLSA. Prior investigations of the Secretary found recordkeeping violations. In conferences and correspondence from the Department of Labor to defendants, the importance of accurate recordkeeping was repeatedly highlighted. Findings 234–239, GX 28 at 3, GX 29. The failure of defendants to keep accurate records after repeatedly being advised of the necessity of doing so supports the conclusion that defendants' conduct was objectively unreasonable. *Bueno v. Mattner*, 829 F.2d 1380, 1386–87 (6th Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct.1994, 100 L.Ed.2d 226 (1988). The conclusion that defendants' conduct was objectively unreasonable is further supported by the practice of deducting lunch breaks regardless of whether or not such breaks were taken without making an effort to ascertain whether employees were taking the breaks. *Cf. Brennan v. Elmer's Disposal Service, Inc.*, 510 F.2d 84, 88 (conclusion that wage computation method violates FLSA strengthened by flat hourly lunch deduction without reference to hours worked).

■ Employees need not establish that violations were intentional to obtain a liquidated damages award. *Williams*, 747 F.2d

at 129. The evidence here comes very close to establishing that the violations of the recordkeeping and overtime provisions were intentional. The record is not "silent as to any efforts [defendants] made to ascertain and follow the dictates of the FLSA." *Id.* To the contrary, the evidence shows defendants were informed of and attempted to ascertain the requirements of the FLSA, and then attempted to evade the requirements. Therefore, I conclude defendants have failed to meet their burden, and shall award liquidated damages under section 16(c) of the Act.

■ "In deciding whether to issue a prospective injunction, the district court must evaluate the previous conduct of the employer and the dependability of his promise for future compliance." *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d at 197. In light of the seven prior investigations of defendants which found many of the same violations that the instant action uncovered, the repeated failures of defendants to make reasonable attempts to comply with the dictates of the FLSA, and defendants' wholesale disregard for the recordkeeping requirements of the Act, despite repeated admonitions of their significance, the only reasonable conclusion is that an injunction against further noncompliance with the FLSA is necessary to conform defendants' conduct to the law.

## CONCLUSIONS OF LAW

1. Jurisdiction is proper under sections 16 and 17 of the FLSA and 28 U.S.C. § 1331.

2. Defendants Solid Waste, JPM, Hoch, Lackawanna, Pasquale Mascaro, Joe Mascaro and Mike Mascaro are employers within the meaning of section 3(d) of the Act, and are therefore jointly and severally liable for violations of the Act.

3. Defendants constitute an enterprise within the meaning of section 3(r) of the Act.

4. Defendants violated section 12(c) of the Act by employing minors as outside helpers on vehicles. That occupation constitutes oppressive child labor as defined

by Hazardous Order No. 2, 29 C.F.R. § 570.52.

5. Defendants violated section 7 of the Act by failing to pay certain non-exempt employees time and one-half their regular rate of pay for hours worked in a week in excess of forty. These violations resulted from defendants' failure to pay hourly employees for hours worked during periods defendants deducted for meal breaks, totaling 2½ hours per week, the failure to include "bonus" payments in the employees' regular rate of pay, and the failure to pay the following classes of employees in accordance to the hours worked:[22]

a. JPM:

Classification 200 employees worked 12 hours per day and are entitled to 2½ hours for lunch breaks not taken.

Classifications 201 and 202 worked an additional 5 hours per week for which they were not compensated, including 2½ hours for lunch breaks not taken.

Classification 203 employees worked an average of 6¼ hours per trip between Souderton and Dunmoore.

Classification 301 employees are entitled to an additional 17½ hours per week including 2½ hours for lunch breaks not taken and hours worked that were not properly recorded in the period before August 31, 1987. Employees Joann Imalka, Sharon Levandowski and Deborah Tomazewski are entitled to an additional 5 hours per week of compensation. Employee Homer Butler is entitled to an additional 17 hours per week of compensation.

b. Hoch:

Classifications 200, 201, 202 and 300 employees are entitled to an additional 2½ hours per week of compensation, and to have bonus payments included in their base rate of pay.

Classifications 303 and 305 employees are entitled to payment based on the hours worked as reflected by defendants' payroll records with bonus payments included in their base rate of pay, and an additional 2½ hours per week for lunch breaks not taken.

Classification 306 employees are entitled to payment of wages based on a 70 hour work week.

c. Lackawanna:

Tractor-trailer drivers of Lackawanna are entitled to wages based on work weeks computed using the hours per trip as follows:

For trips from Dunmoore to Abington, 6½ hours.

For trips from Dunmoore to Lower Merion, 7 hours.

For trips from Abington to Morrisville, 3½ hours.

For trips from Lower Merion to Morrisville, 4 hours.

For trips from South Philadelphia to Dunmoore, 8½ hours.

For trips from Abington to Buckhorn, 6½ hours.

Yard jockeys are entitled to compensation based on 45 hour work week.

6. The Secretary has failed to establish that JPM classification 300 employees worked in excess of forty hours in a week, and are entitled to any backwages.

7. Defendants' failure to pay employees in conformity with the hours worked as described above resulted in defendants violating section 6 of the Act by failing to pay certain employees wages at less than $3.35 per hour, the statutory rate.

8. As of June 24, 1987, JPM employees, except classification 203, are exempt from section 7 of the Act under section 13(b)(1) and 29 C.F.R. § 782.

9. JPM classification 203 employees for whom the Secretary seeks backwages were not exempt from section 7 of the Act for any period relevant to this action.

10. As of September 30, 1987, Hoch employees, except classification 306, are ex-

---

**22.** Where appropriate, the weekly hourly figure assumes a full work week of five or five and one-half days.

empt from section 7 of the Act under section 13(b)(1) and 29 C.F.R. § 782.

11. As of November 30, 1987, Hoch classification 306 employees are exempt from section 7 of the Act under section 13(b)(1) and 29 C.F.R. § 782.

12. Only those employees of Lackawanna who are shown on defendants' records as taking trips in interstate commerce during the period from December, 1987 until April 1988 are exempt from section 7 of the Act under section 13(b)(1) and 29 C.F.R. § 782 for the period during which they took such trips and for a four month period thereafter.

13. Defendants have failed to establish that employees who transported property to Buckhorn are entitled an exemption under section 13(b)(1) and 29 C.F.R. § 782.

14. As of December 30, 1988, employees of Lackawanna are engaged in interstate commerce and therefore, are exempt from section 7 of the Act under section 13(b)(1) and 29 C.F.R. § 782.

15. Defendants violated section 11(c) of the Act; their records do not accurately reflect the hours worked and the hourly rate of pay, including time and one-half for overtime, for employees.

16. Defendants willfully withheld backwages resulting from violations of sections 6 and 7 of the Act from employees of JPM, Hoch, and Lackawanna.

17. Plaintiff is entitled to restitutionary and permanent prospective injunctive relief prohibiting defendants from further violations of sections 6, 7, 11(c), 12(c), 15(a)(2), 15(a)(4) and 15(a)(5).

18. Defendants' violations of the Act were willful in that the violations were either intentional or in reckless disregard of the requirements of the FLSA. Accordingly, a three year statute of limitations applies to this action.

19. Defendants have failed to establish that the violations resulted from an objectively reasonable or good faith attempt to comply with the Act. Plaintiff, therefore, is entitled to liquidated damages in an amount equal to the amount of backwages

due to employees to be computed by the Secretary in accordance with this opinion.

An appropriate order follows.

## ORDER

In accordance with the foregoing findings of fact and conclusions of law,

1. Plaintiff's Motion to Amend the Complaint to include Lackawanna Transport Company, Inc. as a defendant to this action is GRANTED.

2. Defendants' Motion for a Directed Verdict on the Secretary's claim for liquidated damages under section 16(c) of the Fair Labor Standards Act is DENIED.

3. Judgment on the amended complaint shall be entered IN FAVOR OF plaintiff Elizabeth Dole, Secretary of Labor and AGAINST defendants SOLID WASTE SERVICES, INC., a corporation, trading as J.P. MASCARO & SONS and as HOCH SANITATION and as LACKAWANNA TRANSPORT COMPANY, INC.; J.P. MASCARO & SONS, INC., trading as J.P. MASCARO & SONS and HOCH SANITATION and LACKAWANNA TRANSPORT COMPANY, INC.; PASQUALE MASCARO, Individually as employer for SOLID WASTE SERVICES, INC. and J.P. MASCARO & SONS, INC.; MIKE MASCARO, Individually as employer for SOLID WASTE SERVICES, INC. and J.P. MASCARO & SONS, INC.; JOSEPH P. MASCARO, Individually as employer for SOLID WASTE SERVICES, INC. and J.P. MASCARO & SONS, INC..

4. The Secretary shall submit revised wage computation sheets, a proposed judgment order, and a proposed permanent injunction in accordance with the foregoing findings of fact and conclusions of law not later than August 1, 1989.

IT IS SO ORDERED.